[859 NE2d 484, 825 NYS2d 678]

DAVID POLICANO, Respondent, v VICTOR T. HERBERT, Appellant.

Argued October 19, 2006; decided November 16, 2006

**POINTS OF COUNSEL**

*Charles J. Hynes, District Attorney,* Brooklyn (*Leonard Joblove* and *Rhea A. Grob* of counsel), for appellant. Under New York law at the time defendant's conviction of depraved indifference murder became final, the evidence at defendant's trial was legally sufficient to establish his guilt of that crime. (*People v Feingold,* 7 NY3d 288; *People v Roe,* 74 NY2d 20; *People v Register,* 60 NY2d 270, 466 US 953; *People v Lynch,* 95 NY2d 243; *People v Ford,* 66 NY2d 428; *People v Contes,* 60 NY2d 620; *People v Lee,* 35 NY2d 826; *People v Borst,* 232 AD2d 727; *People v Tuck,* 87 NY2d 828; *People v Chrysler,* 85 NY2d 413.)

*Law Offices of Richard Ware Levitt,* New York City (*Richard Ware Levitt* of counsel), for respondent. The facts, as a matter of law, do not support a finding of recklessness. (*People v Sanchez,* 98 NY2d 373; *People v Gaines,* 83 NY2d 925; *People v Rodriguez,* 76 NY2d 918; *People v Lee,* 35 NY2d 826; *People v Borst,* 232 AD2d 727; *People v Suarez,* 6 NY3d 202; *People v Gallagher,* 69 NY2d 525.)

**OPINION OF THE COURT**

READ, J.

The United States Court of Appeals for the Second Circuit has posed three certified questions that call upon us to address New York law regarding depraved indifference murder at the time defendant David Policano's conviction for this crime became final on June 28, 2001, and to answer related questions. We begin by rehearsing the relevant facts and prior proceedings in this case.

I.

On January 21, 1997, Raphaela Robles was standing in front of her apartment building in Brooklyn, talking with defendant. Upon observing them, her boyfriend, Terry Phillips, became "upset," and he and defendant began "[p]ushing, shoving and talking." As Robles fled upstairs to her third-floor apartment, she turned around and saw Phillips with a pipe. After entering her apartment, she looked out the window and saw defendant bleeding.

Detective Alonzo Hobbs, who was investigating the assault, spoke with defendant in the hospital the same day. Defendant's head was bandaged, and he appeared to be "very angry" and "hurt from the pain." Defendant explained to Detective Hobbs that he and Phillips had argued and fought earlier in the day,

and that he had knocked Phillips unconscious. Although defendant initially insisted that he would "take care of" this matter himself and did not want police intervention, he subsequently filed a complaint against Phillips with the police.

Shortly before 8:00 P.M. on January 27, 1997, Jimmy Sprye was in his apartment in Brooklyn, a few blocks away from the intersection of Carlton and Myrtle avenues, when he was visited by his friend Neicy Wright and defendant, whom he had not met before that evening. Defendant and Wright arrived with a "dime bag" of crack, which all three of them smoked. Defendant had bathrobes with him, and he and Wright would leave periodically with bathrobes to sell, and then return to pick up more. Twice, defendant left unaccompanied by Wright. On the first of these two occasions, he appeared nervous when he returned, and told Sprye that someone had been shot on Myrtle Avenue.

That same evening, Phillips and his friend Lonny Stagg arrived at the bus stop at the well-lit corner of Carlton and Myrtle avenues at about 8:40 or 8:45 P.M. Phillips stood at the corner, while Stagg stood within the glass bus shelter, five to seven feet away from Phillips, reading the bus schedule. Stagg then noticed defendant, who was about 20 feet away from him. Defendant was wearing a jacket, which was either navy blue or black with white stripes running down the sleeves.

Seconds later, Stagg heard a gunshot and "took off." After advancing 50 feet, he wheeled around and saw Phillips holding his arm over his face as if to shield himself. Stagg heard two additional shots as he resumed his flight. He could not see the shooter's face, which was obscured by a poster in the bus shelter, but he saw the gun in the right hand of someone wearing the same style and color jacket that he had observed on defendant moments earlier. The gun appeared to be three to five feet away from Phillips. When Stagg reached a nearby pizzeria, he yelled for someone to call 911. He then went back outside, and saw the shooter running down Carlton Avenue.

The subsequent autopsy showed that Phillips had been shot twice in the head, once in the neck, and once in the right thigh. According to the medical examiner, the location of the three gunshot wounds to Phillips's head and neck was consistent with those shots having been fired while Phillips was standing upright and turning. The location of the gunshot wound to Phillips's thigh was consistent with that shot having been fired after

Phillips had fallen to the ground, with the shooter standing near Phillips's head and aiming toward his feet. The absence of stippling near any of the gunshot wounds showed that they were fired from a distance greater than 12 to 18 inches.

Defendant was indicted for intentional murder (Penal Law § 125.25 [1]) and depraved indifference murder (Penal Law § 125.25 [2]) as well as criminal possession of a weapon in the second degree (Penal Law § 265.03) and criminal possession of a weapon in the third degree (Penal Law § 265.02 [4]). Testifying in his own defense at trial, defendant protested his innocence and presented an alibi.

At the close of the defense case, defendant's attorney moved to dismiss the count of depraved indifference murder on the ground that there was no evidence that defendant had acted recklessly or wantonly. The trial judge denied the motion. After summations, defendant's attorney renewed this objection, and the court adhered to its original decision.

The trial judge submitted one count of depraved indifference murder and one count of intentional murder to the jury, but not the weapons charges. Unusually, he instructed the jurors not to consider the count of intentional murder if they first found defendant guilty of depraved indifference murder. After the jury found defendant guilty of depraved indifference murder, the court sentenced him as a second felony offender to a term of imprisonment of 25 years to life.

Defendant appealed, asserting that the evidence was legally insufficient to prove his guilt of depraved indifference murder. The People argued before the Appellate Division that while there was "no question" that defendant fired his gun intentionally rather than accidentally, a rational trier of fact could have concluded that defendant did so with depraved indifference to the risk of death that he created for "Phillips and any bystander in the public place." The People also contested defendant's "claims that multiple gunshot wounds to vital organs necessarily dictate[ ] a verdict of intentional murder and render[ ] a verdict of depraved indifference murder presumptively insufficient." Forcefully, the People argued,

> "there was evidence that defendant may have had a motive to shoot the victim. Indeed, there is a reasonable view of the circumstantial evidence that defendant intended to kill the victim when he fired. The jury, however, was called upon to deliberate first

upon the alternative count of depraved indifference murder. Because a reasonable trier of fact could easily find that [a] defendant [who] fired his gun in a bus stop on a public street with other people present demonstrated an unmotivated wickedness so great as to be indicative of depravity, the verdict is supported by legally sufficient evidence" (internal quotation marks and citations omitted).

These arguments carried the day. On November 13, 2000, the Appellate Division affirmed defendant's conviction. "Viewing the evidence in the light most favorable to the prosecution," the Court found "that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt" (*People v Policano*, 277 AD2d 331, 331-332 [2d Dept 2000] [citation omitted]). Exercising its broad factual review power, the Appellate Division further pronounced itself "satisfied that the verdict of guilt was not against the weight of the evidence" (*id.* at 332).

On March 30, 2001, a Judge of our Court denied defendant's application for leave to appeal (*People v Policano*, 96 NY2d 786 [2001]). Defendant's conviction became final 90 days later, on June 28, 2001, when his time for filing a petition for writ of certiorari in the United States Supreme Court expired (*see* Rules Sup Ct rule 13 [1]; *Clay v United States*, 537 US 522, 527 [2003]).

Defendant subsequently filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of New York, in which he asserted that the evidence at trial was insufficient to prove his guilt of depraved indifference murder. On March 26, 2004, the District Court Judge heard oral argument at which defendant appeared pro se by telephone. As the Judge explained in his order of the same date:

"At today's oral argument . . . , I told the parties that I would deny the petition. Immediately after the argument, however, I learned of a case decided yesterday by the New York Court of Appeals, People v. Gonzalez [1 NY3d 464 (2004)]. In Gonzalez, the Court of Appeals affirmed an opinion by the Appellate Division reversing the defendant's conviction for depraved indifference murder where the jury had acquitted the defendant of intentional murder and the evidence at trial showed that the defendant had shot his victim in the chest from a distance of six to seven feet, shot the victim again in the head

as the victim fell, and finally fired eight more shots into the victim's prone back and head."

"In light of Gonzalez,"—which, as the Judge noted, we had handed down the day before—he decided to reconsider his position on whether there was sufficient evidence for a jury to find that defendant had acted with depraved indifference. He directed the court's clerk to appoint counsel for defendant, and the parties to brief the issue.

Viewing defendant's case as "largely indistinguishable" from *Gonzalez*, on September 7, 2004 the District Court concluded that there was insufficient evidence to establish that defendant acted recklessly with respect to Phillips's death, and so granted the habeas petition (*Policano v Herbert*, 2004 WL 1960203, *9, 2004 US Dist LEXIS 17785, *25 [ED NY, Sept. 7, 2004]). The People appealed. Defendant was released from custody following the Second Circuit's denial of a stay pending appeal on December 28, 2004 (*Policano v Herbert*, 453 F3d 75, 78 [2d Cir 2006]).

On November 15, 2005, the Second Circuit affirmed the District Court, resting principally on *People v Gallagher* (69 NY2d 525 [1987]), as subsequently "explain[ed] and reaffirm[ed]" in *People v Gonzalez* and *People v Payne* (3 NY3d 266 [2004]), which, the court concluded, "represent[ed] not the creation of a new legal principle, but the application of long-settled New York law to new facts" (430 F3d 82, 88 n 1, 93 [2d Cir 2005]). The court agreed with the District Court that "the facts of this case [were] not materially different from those of *Gonzalez*" (430 F3d at 89). On June 21, 2006, the Second Circuit issued a split decision declining en banc consideration of the appeal (*Policano v Herbert*, 453 F3d 79 [2d Cir 2006, Raggi and Wesley, JJ., dissenting]), and the original three-judge panel certified three questions to us (*Policano v Herbert*, 453 F3d 75 [2d Cir 2006]). The panel advised us that it did "not intend to limit the scope of [our] analysis or [our] response" to the questions certified, which we were free to expand "to cover any further pertinent issue . . . appropriate to address" (*id.* at 76).

As for defendant, the People presented this case to a new grand jury. On April 21, 2006, the People filed an indictment charging him with the same two weapon possession counts charged in the original indictment. After defendant's arraignment on the pending new indictment, he was incarcerated pursuant to a securing order fixing bail in the amount of $100,000. On October 19, 2006, as a result of a decision and order of

Supreme Court, the indictment was dismissed and defendant was released from custody.

## II.

### Certified Question No. 1

"On [June 28, 2001] (the date on which petitioner Policano's conviction became final), under the law of the State of New York as established by, *inter alia, People v. Gallagher* [69 NY2d 525 (1987)], where the evidence produced at trial indicated that if the defendant committed the homicide at all, he committed it with the conscious objective of killing the victim, would a jury be permitted to find that the elements of depraved indifference murder were satisfied beyond a reasonable doubt?" (453 F3d at 76.)

In *People v Feingold* (7 NY3d 288 [2006]), a decision handed down just after this certification, we recounted the history and recent progression of our depraved indifference jurisprudence. As outlined in *Feingold*, the law of the State of New York in this area was articulated by *People v Register* (60 NY2d 270 [1983], *cert denied* 466 US 953 [1984]) and remained static through our decision in *People v Sanchez* (98 NY2d 373 [2002]), which reaffirmed *Register*. After *Sanchez*, a series of decisions—*People v Hafeez* (100 NY2d 253 [2003]), *Gonzalez, Payne* and *People v Suarez* (6 NY3d 202 [2005])—incrementally "pointed the law in a different direction," culminating in our explicit overruling of *Register* and *Sanchez* in *Feingold* (7 NY3d at 292, 294; *see also People v Swinton*, 7 NY3d 776 [2006, Kaye, Ch. J., Ciparick and Graffeo, JJ., concurring in result on constraint of *Feingold*). Accordingly, to answer this question we must first consider *Register* and then *Sanchez*, as these two decisions bracket defendant's conviction.

### Register

Register, who had been drinking heavily all day with a friend, carried a loaded pistol with him and predicted that he was "going to kill somebody tonight" when he and the friend arrived at a crowded bar in the early evening to continue their carousing. Sometime after midnight, Register fired his gun at Mitchell, with whom his friend was arguing, missed him and instead hit and injured Evans, another bar patron who had interceded in

the dispute. Register then shot Mitchell in the stomach at close range. As patrons were fleeing the bar and tending the wounded, a third man, Lindsey—a friend or acquaintance of Register's—walked by and Register, for no apparent reason, turned around and shot him to death.

Register was indicted for both intentional and depraved indifference murder. At trial, his attorney requested jury instructions on the effect of intoxication. While the judge instructed the jurors that they should consider whether Register's intoxication prevented him from forming an intent to kill, he refused to charge that intoxication could affect the mens rea of depraved indifference murder. The jury acquitted Register of intentional murder and convicted him of depraved indifference murder.

Depraved indifference murder requires that the accused "recklessly" create a "grave" risk of death "[u]nder circumstances evincing a depraved indifference to human life" (Penal Law § 125.25 [2]). Under the Penal Law, a person acts "recklessly" with respect to a proscribed result (here, death) "when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur"; however, "[a] person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto" (Penal Law § 15.05 [3]; see also Penal Law § 15.25 [while intoxication is not a defense to a criminal charge, "evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negative an element of the crime charged"). On appeal, Register contended that depraved indifference murder requires a mens rea greater than simple recklessness—that is, "a different or additional element of mental culpability, namely 'circumstances evincing a depraved indifference to human life,' " which is what heightens the blameworthiness of a reckless killing sufficiently to transform manslaughter into murder; therefore, the trial judge should not have precluded the jury from considering the effect of intoxication on his state of mind (*Register*, 60 NY2d at 275, 276). We rejected this argument and affirmed Register's conviction.

■ We first noted that although "[t]he Penal Law does not expressly define the term 'element,' " it "set[s] forth what the 'elements' of an offense are and identifies them, as does the common law, as a culpable mental state (*mens rea*) and a voluntary act (*actus reus*)," citing Penal Law § 15.10 (*id.* at 276).

"Consistent with that provision, the statutory defi-

nition of depraved mind murder includes both a mental element ('recklessly') and a voluntary act ('engaging in conduct which creates a grave risk of death to another person'). Recklessness refers to defendant's conscious disregard of a substantial risk and the act proscribed, the risk creating conduct, is defined by the degree of danger presented. Depraved mind murder resembles manslaughter in the second degree (a reckless killing which includes the requirement that defendant disregard a substantial risk), but the depraved mind murder statute requires in addition not only that the conduct which results in death present a grave risk of death but that it also occur '[u]nder circumstances evincing a depraved indifference to human life.' " (*Id.* [citations omitted].)

Specifically, we held in *Register* that this "additional requirement"—that is, "under circumstances evincing a depraved indifference to human life"—"refers to neither the *mens rea* nor the *actus reus*." (*Id.*) Indeed, "[i]f it states an element of the crime at all, it is not an element in the traditional sense but rather a definition of the factual setting in which the risk creating conduct must occur—objective circumstances which are not subject to being negatived by evidence of defendant's intoxication" (*id.*).

In short, we held that recklessness, pure and simple, is the mens rea for depraved indifference murder, which is "distinguishable from manslaughter[ ] not by the mental element involved but by the objective circumstances in which the act occurs"; these circumstances define the degree of risk created by the defendant (*id.* at 278). As a result, "the focus of the offense is not upon the subjective intent of the defendant, as it is with intentional murder, but rather upon an objective assessment of the degree of risk presented by defendant's reckless conduct" (*id.* at 277 [citations omitted]).

### Sanchez

Sanchez and Range were the boyfriends of two sisters. They encountered each other at a family birthday party for the daughter of Sanchez's girlfriend. While the couples generally enjoyed a "cordial relationship," Sanchez and Range exchanged "harsh words . . . in a hallway near the foyer entrance of the apartment when Range implied that [Sanchez] was unfaithful to [his girlfriend]" (*Sanchez*, 98 NY2d at 375). After Range told

Sanchez to "step outside," the only eyewitness to the shooting saw Sanchez walking through a doorway from a hallway "where [two children] were playing in the foyer, away from Range, who was behind the partially opened door. Then she saw [Sanchez] abruptly turn around, fire a gun pointed at Range's chest and flee. The entire incident was over in a matter of seconds" (*id.* at 375-376). Range died in the hospital from a wound caused by the single bullet, which was fired not more than 12 to 18 inches from his chest. After a jury trial, Sanchez was acquitted of intentional murder but convicted of depraved indifference murder.

Sanchez argued that the evidence was consistent only with an intentional killing, and thus there was no reasonable view of the evidence under which he could have been found guilty of causing Range's death recklessly (the requisite mens rea for depraved indifference murder), rather than intentionally. Alternatively, he contended that there was no evidence of "circumstances evincing a depraved indifference to human life." We disagreed on both scores.

First, viewing the evidence in the light most favorable to the People, the *Sanchez* court concluded that a rational jury could have "harbor[ed] a reasonable doubt that the homicide of Range was intentional—i.e., that defendant's conscious objective [was] to cause [Range's death]" (*id.* at 377 [internal quotation marks and citation omitted]). "Although the gun was discharged at point-blank range, the bullet only struck Range in his upper left chest" (*id.*). Further, the jury might "also have taken into account the preexisting good relations between [Sanchez] and Range, and concluded that this was an instantaneous, impulsive shooting—perhaps to disable or frighten Range, rather than to kill him," and thus "could have found that [Sanchez's] homicidal level of mental culpability was reckless rather than intentional" (*id.* at 377-378).

As for Sanchez's other argument, we concluded that if we "accept[ed] the jury's determination that the killing of Range was not intentional," then Sanchez's

> "shooting into [Range's] torso at point-blank range presented *such a transcendent risk of causing his death that it readily [met] the level of manifested depravity needed to establish [depraved indifference murder]*. Here, once it rejected intentional murder, the jury . . . could reasonably [have] conclude[d]

that [Sanchez's] conduct was so manifestly destined to result in Range's death as to deserve the same societal condemnation as purposeful homicide" (*id.* at 378 [emphasis added and citations omitted]).

We cited *Register* to support this proposition. As we articulated the same idea elsewhere in the opinion:

"That [Sanchez's] conduct involved *such a high risk of death that it could also lead to the conclusion that it was intentional supports rather than detracts from characterizing it as evincing depraved indifference to human life.* . . . [P]urposeful homicide itself is the ultimate manifestation of indifference to the value of human life" (*id.* at 384 [emphasis added]).

*Sanchez* epitomized our depraved indifference jurisprudence under the *Register* regime, the hallmarks of which—at least with respect to fatal one-on-one shootings or knifings—were twofold. First, even though such an attack by its very nature presents compelling circumstantial evidence of intent to cause death, we considered the question of the defendant's state of mind to be a classic matter for the jury. This strain of thought in our decisional law long predated *Register* (*see e.g. People v Flack*, 125 NY 324, 334 [1891] ["However clear the proof may be, or however incontrovertible may seem to the judge to be the inference of a criminal intention, the question of intent can never be ruled as a question of law, but must always be submitted to the jury"]; *see also People v Butler*, 86 AD2d 811 [1st Dept 1982] [reversing jury verdict convicting defendant of manslaughter in the first degree because evidence that deceased was shot twice at relatively close range, once in the back and once in the head, could only demonstrate intent to kill rather than intent to cause serious injury], *revd on dissenting op of Sandler, J.*, 57 NY2d 664 [1982] [faulting majority for drawing definitive conclusions about intent from fact that bullet entered victim's head]). As we emphasized in *People v Gallagher* (69 NY2d 525, 530 [1987]), "[i]t is not for the [court] in the first instance to determine whether defendant acted intentionally or recklessly at the time of the crime. That is the jury's function." Relatedly, we also made clear in *Gallagher* that the trial court must submit counts of intentional and depraved indifference murder to the jury in the alternative. Although the evidence at trial might be susceptible to establishing either mental state, intentional murder and depraved indifference murder "are inconsistent counts as defined in CPL 300.30 (5), because guilt of one necessarily negates guilt of the other" (*id.* at 529).

Second, the factual setting in which the risk-creating conduct must occur, viewed objectively—*Register*'s standard for determining whether there are circumstances evincing a depraved indifference to human life—was fulfilled if a defendant's actions created an almost certain risk of death by, for example, shooting the victim in the head multiple times at close range. As we expressed this concept in *Sanchez*, where the defendant's actions created "a transcendent risk" of causing death, "the level of manifested depravity needed to establish [depraved indifference murder]" was "readily" met (*Sanchez*, 98 NY2d at 378).

### Answer to Certified Question No. 1

In light of our case law in this area, the first question is not easily answered as posed. Initially, as already discussed, at the time defendant's conviction became final, *Register*—not *Gallagher*—governed the legal sufficiency of the evidence needed to establish guilt for depraved indifference murder. Before we handed down our post-*Sanchez* decisions, *Gallagher* was read as limited to charging procedure (*see e.g. People v Keefer*, 197 AD2d 915, 916 [4th Dept 1993] [citing *Gallagher* for the proposition that "the counts of intentional and reckless murder were properly submitted to the jury in the alternative," the Court went on to conclude that "it is not a valid challenge to the conviction of reckless murder that the evidence tended to establish defendant's guilt of intentional murder" because "(t)he greater culpable mental state includes the lesser," citing *People v Green*, 56 NY2d 427, 432 (1982)]). Indeed, we said as much ourselves in *Sanchez* when we concluded that strong proof of intent did not foreclose the jury from finding recklessness and depraved indifference (*see* 98 NY2d at 378). Even though the defendant in *Sanchez* pressed arguments of legal insufficiency based on *Gallagher*, the *Sanchez* majority did not mention *Gallagher*.

Next, it has never been permissible in New York for a jury to convict a defendant of depraved indifference murder "where the evidence produced at trial indicated that if the defendant committed the homicide at all, he committed it with the conscious objective of killing the victim" (in the words of the first question). As discussed at some length, however, under *Register*—and until we started to recast "under circumstances evincing a depraved indifference to human life" post-*Sanchez*—where both intentional and depraved indifference murder were charged in one-on-one shootings or knifings, these counts were submitted

to the jury for it to sort out the defendant's state of mind unless there was absolutely no evidence whatsoever that the defendant might have acted unintentionally. That a defendant's acts virtually guaranteed the victim's death did not, in and of itself, preclude a guilty verdict on a theory of depraved indifference. To the contrary and as the dissenters in both *Register* and *Sanchez* vociferously protested, under the *Register* formulation the very facts establishing a risk of death approaching certainty and thus presenting compelling circumstantial evidence of intent—for example, a point-blank shooting of the victim in the head—likewise demonstrated depraved indifference. This was the law of the State of New York at the time defendant's conviction became final.

In short, it is now clear that under New York law "a one-on-one shooting or knifing (or similar killing) can almost never qualify as depraved indifference murder" (*Payne*, 3 NY3d at 272); that "[a] defendant may be convicted of depraved indifference murder when but a single person is endangered in only a few rare circumstances" (*Suarez*, 6 NY3d at 212); and that " 'depraved indifference to human life' is a culpable mental state" (*Feingold*, 7 NY3d at 296). Thus, there is no doubt that under the law of New York today, a jury would not be permitted to find defendant guilty of depraved indifference murder on the evidence in this record.

At the time defendant's conviction became final, however, *Register* defined New York law, and so this case would have been a close one for the jury to decide. And indeed, the jury decided that defendant committed reckless homicide as a basis for depraved indifference murder. As the People point out, the jurors heard evidence that defendant ingested crack cocaine approximately 45 minutes before shooting Phillips, and that the final shot to his helplessly prone victim hit his thigh, not a vital organ. Although there was certainly reason to believe that defendant may have borne a grudge against Phillips, there is considerable doubt that he acted with premeditation or sought out Phillips to seek revenge (a factual distinction between this case and *Gonzalez* bearing on intent); the violence here seems to have erupted spontaneously after a chance encounter on the street. Defendant shot Phillips in the head and neck three times at a range of three to five feet in a public place, an urban bus stop. And most critically of all, we had not yet decided any of our cases cutting back on *Register*. We had not yet even decided *Sanchez*, which ratified *Register*'s continued authority. Thus—to

answer the first question as reframed by Judge Raggi—under the law of New York at the time defendant's conviction became final, on this record the jury was permitted to find him guilty of depraved indifference murder.

In this regard, it is perhaps instructive that the District Court Judge initially denied defendant's habeas petition. He reconsidered and reversed his decision only after learning about our slip opinion the previous day in *Gonzalez*, an early case in the evolution of our depraved indifference jurisprudence away from *Register* and *Sanchez*, leading eventually to *Feingold*.

### Certified Question No. 2

"At the time Policano's conviction became final, what were the established elements of depraved indifference murder?" (453 F3d at 76.)

■ As discussed in answer to the first question, at the time defendant's conviction became final, the People were required to prove that defendant (1) recklessly engaged in conduct (2) which created a grave risk of death to another person (3) thereby causing the death of another person (4) under circumstances evincing a depraved indifference to human life. The mens rea of depraved indifference murder was recklessness and, as we held in *Register*, "under circumstances evincing a depraved indifference to human life" defined the factual setting, viewed objectively, in which the risk-creating conduct occurred.

### Certified Question No. 3

"Does the interpretation of N.Y. Penal Law § 125.25 (1) and (2) set forth in *People v. Payne*, 3 N.Y.3d 266, 270 . . . (2004) and *People v. Gonzalez*, 1 N.Y.3d 464, 467 . . . (2004), state the correct interpretation of the law of New York with respect to the elements of depraved indifference murder on the date Policano's conviction became final?" (453 F3d at 76.)

■ Register states the correct interpretation of the law of New York with respect to the elements of depraved indifference murder on the date defendant's conviction became final in 2001. Our interpretation of one of those elements—"under circumstances evincing a depraved indifference to human life"— gradually and perceptibly changed from an objectively determined degree-of-risk standard (the *Register* formulation) to a

mens rea, beginning with our decision in *Hafeez* in 2003, continuing in our decisions in *Gonzalez, Payne* and *Suarez* in 2004 and 2005, and ending with our decision in *Feingold* in 2006. We agree with the dissent insofar as it points out that we adhered to a mens rea of recklessness in *Hafeez, Gonzalez, Payne* and *Suarez*. We disagree, however, with the dissent's position that this quartet of cases does not represent a perceptible, evolving departure from the underpinnings of depraved indifference murder as expressed in *Register* and *Sanchez*. As the many concurring decisions and dissents in these cases and the dissent in this case illustrate, individual judges hold differing views as to where along this trajectory a majority of the Court may have effectively passed the point of no return—the limit beyond which, hard as we may have tried, it was simply not possible to reconcile our developing case law with *Register* and *Sanchez*. There is no doubt, however, that a majority of the Court explicitly overruled *Register* and *Sanchez* in *Feingold*, holding that " 'depraved indifference to human life' is a culpable mental state" (7 NY3d at 296). This raises the question whether our post-*Sanchez* case law applies retroactively to defendant's case, an issue that Judge Raggi in her dissent intimates that we may wish to address. We conclude that it does not.

Under *People v Pepper* (53 NY2d 213 [1981]), we must weigh three factors to determine whether a new precedent operates retroactively: the purpose to be served by the new standard; the extent of the reliance by law enforcement authorities on the old standard; and the effect on the administration of justice of a retroactive application of the new standard. The second and third factors are, however, only given substantial weight "when the answer to the retroactivity question is not to be found in the purpose of the new rule itself" (*id.* at 220, citing *Desist v United States*, 394 US 244, 249 [1969]). "Thus, where otherwise there could be a complete miscarriage of justice, current constitutional standards that go to the heart of a reliable determination of guilt or innocence have been substituted for those in effect at the time of trial" (*Pepper*, 53 NY2d at 221).

This is not such a case. The purpose of our new interpretation of "under circumstances evincing a depraved indifference to human life" is to dispel the confusion between intentional and depraved indifference murder, and thus cut off the continuing improper expansion of depraved indifference murder. Moreover, in the words of the concurring Judges in *Suarez*, the goal is to "make future homicide prosecutions more sustainable,

increasing the likelihood that defendants who are proven beyond a reasonable doubt to have committed intentional murder will be properly held to account for that crime" (*Suarez*, 6 NY3d at 217). Further, "[d]efendants who commit[ ] vicious crimes but who may have been charged and convicted under the wrong section of the statute are not attractive candidates for collateral relief after their convictions have become final" (*id.* at 217-218). In short, nonretroactivity poses no danger of a miscarriage of justice.

Finally, the other two *Pepper* factors strongly favor nonretroactivity. For two decades prosecutors relied on *Register*'s objectively determined degree-of-risk formulation when making their charging decisions (*see Sanchez*, 98 NY2d at 387 [Appendix]). In addition, retroactive application would potentially flood the criminal justice system with CPL 440.10 motions to vacate convictions of culpable intentional murderers who were properly charged and convicted of depraved indifference murder under the law as it existed at the time of their convictions.

Accordingly, the certified questions should be answered in accordance with this opinion.

Chief Judge KAYE (dissenting in part). As with all precedent-bound courts in the limited business of resolving only the controversies that come before them, our individual decisions necessarily reflect the careful evolution of law, step by step, as doctrine develops through the incremental process of case-based adjudication. As rules laid down in prior cases are applied to novel and distinct fact patterns, principles are refined and the law settled. Such is the nature, and enduring power, of our system of jurisprudence.

When, as in *People v Gonzalez* (1 NY3d 464 [2004]), the Court undertakes to resolve new cases based on established principles, thereby shaping and perhaps even extending those principles to meet new situations, we are not, by so doing, "changing the law," but are instead simply engaging in the normal progression of judicial deliberation and decisionmaking, as have courts over hundreds of years. Much more rarely, as we come to discover that a preexisting rule, once thought defensible, no longer serves the ends of justice or withstands "the cold light of logic and experience" (*Broadnax v Gonzalez*, 2 NY3d 148, 156 [2004]), we may decide to overrule settled precedent. But such a decision, made in derogation of the important policy of stare decisis, is not taken lightly, or unconsciously. Rather, in that circumstance,

as in *People v Feingold* (7 NY3d 288 [2006]), we know how to make clear our intention to abandon prior case law, and our reasons for taking that drastic step, and we do so.

Over the last several years, there have been two distinct threads in our developing depraved indifference murder jurisprudence—only one of which effected an actual "change" in settled precedent.

The first line of cases holds that evidence of a manifestly intentional killing cannot sustain a conviction for depraved indifference murder and is based—as we made clear in the Court's unanimous opinion in *People v Gonzalez* (1 NY3d at 468)—on the well-established rule of *People v Gallagher* (69 NY2d 525 [1987]) that intentional murder and depraved indifference murder are inconsistent crimes. This rule was consistently applied in *People v Hafeez* (100 NY2d 253 [2003]); *People v Gonzalez* (1 NY3d 464 [2004]); *People v Payne* (3 NY3d 266 [2004]); *People v Suarez* (6 NY3d 202 [2005])—and *Policano v Herbert*.

As we explained in *Gallagher*, a person cannot at the same time act both intentionally and recklessly with respect to the same result—that is, death. Rather, "guilt of one necessarily negates guilt of the other," since an act "is either intended or not intended; it cannot simultaneously be both" (69 NY2d at 529). The majority asserts that *Gallagher* was originally "read" as limited to charging procedure (majority op at 600), but the principle that evidence of a plainly intentional killing could not, *as a matter of sufficiency*, support a conviction for unintentional homicide was settled as early as *People v Wall* (29 NY2d 863 [1971]).

In *Wall*, we held that because the "record established that defendant was guilty of an intentional shooting or no other" (29 NY2d at 864), a verdict convicting the defendant of criminally negligent homicide could not be sustained. As we explained, "the two bursts of shots, each shot hitting its victim, could not be found to be the result of negligence merely" (*id.*). Although the District Court viewed defendant's case as "largely indistinguishable" from *Gonzalez* (*Policano v Herbert*, 2004 WL 1960203, *9, 2004 US Dist LEXIS 17785, *25 [ED NY, Sept. 7, 2004]), which postdates defendant's conviction, I view it as largely indistinguishable from *Wall*, which long precedes it.

Thus, *Hafeez, Gonzalez* and their progeny did not change the law. Nor were they inconsistent with *People v Sanchez* (98 NY2d

373 [2002]), in which, as we have explained time and again, a conviction for depraved indifference murder was warranted because the shooting occurred in an area where children were playing, thus presenting a heightened risk of unintended injury (*see Hafeez*, 100 NY2d at 259; *Gonzalez*, 1 NY3d at 468; *Payne*, 3 NY3d at 271, 272; *Suarez*, 6 NY3d at 213 n 7). As the Second Circuit noted in affirming the District Court, *Gonzalez* and *Payne* "represent[ed] not the creation of a new legal principle, but the application of long-settled New York law to new facts" (*Policano v Herbert*, 430 F3d 82, 92 [2d Cir 2005]).

The second, separate thread of our developing depraved indifference murder jurisprudence involves depravity as a distinct mens rea. It is with respect to *this* issue that, in *Feingold*, our Court did indeed change the law, overruling the previously settled principle of *People v Register* (60 NY2d 270 [1983]) that the element of depraved indifference referred to the objective circumstances in which the risk-creating conduct must occur, not to a culpable mental state. I concur in the majority's retroactivity analysis with respect to this indisputable change in the law.

I would answer the first certified question in the negative and the third certified question in the affirmative.

Judges ROSENBLATT, GRAFFEO, SMITH and PIGOTT concur with Judge READ; Chief Judge KAYE dissents in part in a separate opinion in which Judge CIPARICK concurs.

Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.27 of the Rules of Practice of the Court of Appeals (22 NYCRR 500.27), and after hearing argument by counsel for the parties and consideration of the briefs and record submitted, certified questions answered in accordance with the opinion herein.