[902 NYS2d 131]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v RICHARD D. DIGUGLIELMO, Respondent.

Second Department, May 25, 2010

**APPEARANCES OF COUNSEL**

*Janet DiFiore, District Attorney*, White Plains (*Raffaelina Gianfrancesco, Anthony J. Servino* and *Maryanne Luciano* of counsel), for appellant.

*Mayer Brown LLP*, New York City (*Andrew H. Schapiro, Brian M. Willen* and *Shane B. Kelbley* of counsel), for respondent.

**OPINION OF THE COURT**

Lott, J.

In 1997, the defendant, off-duty New York City Police Officer Richard D. DiGuglielmo, was convicted of depraved indifference murder for fatally shooting Charles Campbell. At trial, the defendant had proffered a justification defense, contending that he shot Campbell as Campbell was about to strike the defendant's father, Richard B. DiGuglielmo (hereinafter DiGuglielmo Sr.), with a baseball bat. In an order entered September 18, 2008, the County Court, after a hearing, among other things, granted that branch of the defendant's motion which was to vacate his conviction on three grounds: (1) pursuant to CPL 440.10 (1) (h), as unconstitutionally obtained with insufficient evidence of depraved indifference; (2) pursuant to CPL 440.10 (1) (g) on the ground that there was newly discovered evidence which was of such character as to create a probability of a verdict more favorable to the defendant if it had been received at trial; and (3) pursuant to CPL 440.10 (1) (f) and (h) on the ground that the prosecution violated its duty to disclose exculpatory material consisting of the same newly discovered evidence (*see People v DiGuglielmo*, 21 Misc 3d 1103[A], 2008 NY Slip Op 51938[U] [2008]). We reverse the order insofar as appealed from by the People and reinstate the judgment of conviction.

## The Trial

The fatal shooting occurred on October 3, 1996 in the parking lot of the Venice Deli in Dobbs Ferry (hereinafter the Deli), a business owned by the defendant's parents. More than a dozen witnesses observed part or all of the events leading to the shooting. According to the trial testimony, Campbell became angered when DiGuglielmo Sr. applied a sticker to his Corvette, which Campbell had parked in a space reserved for Deli patrons, while he patronized a business across the street. A fight erupted, during which the defendant, DiGuglielmo Sr., and Robert Errico, the defendant's brother-in-law, beat Campbell to the ground, punching him repeatedly with fists and a cell phone before allowing him to get up. The defendant and Errico then headed back toward the Deli as Campbell walked to his Corvette; DiGuglielmo Sr. followed Campbell, apparently attempting to return Campbell's shirt, which had come off in the melee. Campbell then opened the hatch of the Corvette, pulled out a baseball bat, and suddenly swung it, striking DiGuglielmo Sr. in the knee. Just before the strike, two witnesses had the impression that Campbell was about to swing at the level of DiGuglielmo Sr.'s shoulder or head.

At that point, several witnesses observed Campbell backing up as DiGuglielmo Sr. and Errico pursued him, apparently try-

ing to take the bat away, while the defendant ran into the Deli, where he retrieved a handgun. Campbell moved about 40 feet from the Corvette to the end of the parking lot, where witnesses Kevin O'Donnell and Michael Dillon were sitting inside a TCI Cable truck. As Campbell backed up, one witness observed him swing at DiGuglielmo Sr. and Errico "every time they got closer," and another heard Campbell screaming "no" and "get away from me." Several witnesses observed Campbell either holding the bat above his shoulder in a "batter's stance," making small circular motions like a baseball player ready to receive a pitch, or "threatening" DiGuglielmo Sr. with it. Three witnesses thought that Campbell looked "ready" to swing or strike. Campbell had just passed the front of the TCI truck when the defendant ran in front of the truck and, without warning, fired three times.

Estimates of the distance between Campbell and DiGuglielmo Sr. at the moment of the shooting varied greatly. Dillon and another witness placed them 5½ feet apart, three witnesses gave estimates in the range of 12 to 14 feet, and O'Donnell estimated 30 to 40 feet. The defendant testified that he did not intend to kill Campbell, but only to stop him from hitting his father, who was three or four feet away. Afterwards, DiGuglielmo Sr. complained of injury to his right knee and right hand, but told a detective that Campbell had struck him only in the knee. Autopsy findings revealed that one of the three bullets entered the outside of Campbell's left forearm, exited the inside of that forearm, and entered his abdomen, consistent with Campbell standing in a right-handed batter's stance.

Both Dillon and O'Donnell testified at trial that Campbell was in a baseball player's stance, but not swinging the bat, when the defendant fired the gun. This testimony was consistent with the statements they had given to detectives of the Dobbs Ferry Police Department (hereinafter DFPD) on October 8, 1996, but inconsistent with statements they had made on the day of the shooting, October 3, 1996. A few hours after the shooting, Dillon had told a news reporter that Campbell had hit DiGuglielmo Sr. "in the legs and almost the head" and that, in his opinion, the shooting was "self-defense." Later that evening, Dillon had signed a typewritten statement at DFPD headquarters in which he claimed that Campbell "was still swinging the bat at [DiGuglielmo Sr.]" when the defendant ran up and shot him. At trial, on cross-examination, Dillon testified that the statements he had made on October 3rd were incorrect, at-

tributing the inaccuracy to being tired at the time he made them.

Similarly, O'Donnell had given two statements to the DFPD on the evening of the shooting, stating in both that Campbell had raised the bat in a batter's stance and was about to strike when the defendant shot him. Like Dillon, O'Donnell testified at trial that the statements he gave on October 3rd were incorrect and attributed the inaccuracies to being nervous and a little shaken up so soon after the incident.

The trial court submitted to the jury two counts of murder in the second degree on alternate theories that the defendant acted intentionally or recklessly under circumstances evincing a depraved indifference to human life (Penal Law § 125.25 [1], [2]). The jury rejected the justification defense and found the defendant guilty of depraved indifference murder, acquitting him of intentional murder.

### The Defendant's Motion Pursuant to CPL 440.10

On September 21, 2006 the defendant filed a motion to vacate the judgment of conviction pursuant to CPL 440.10 (1) (h) on the ground that it was not supported by legally sufficient evidence of depraved indifference, in violation of his constitutional right to due process. On November 9, 2006 the defendant filed a supplemental motion pursuant to CPL 440.10 (1) (f) and (h) to vacate the conviction on the ground, inter alia, that the People had committed a *Brady* violation (*see Brady v Maryland*, 373 US 83 [1963]) by failing to disclose tape recordings made by the DFPD of interviews with Michael Dillon and James White, an eyewitness who did not testify at trial. Appended to the motion were statements of Dillon and White taken by defense investigators in 2006 in which Dillon and White claimed to have been tape-recorded and subjected to repeated police interrogation in the days following the shooting; Dillon additionally claimed that the undue police pressure had caused him to change his October 3, 1996 statements to a version more favorable to the prosecution.

In opposition, the People sought summary denial of the motion as supplemented, submitting the statements of four police witnesses claiming that no audio recordings had been made. The County Court subsequently accepted additional evidentiary submissions from the parties relevant to the defendant's contention that the police interrogation of Dillon and White constituted newly discovered evidence and exculpatory *Brady* material.

After holding an evidentiary hearing on the issue of whether Dillon had been subjected to undue police influence, the County Court granted the defendant's motion and vacated the judgment of conviction on three independent grounds: (1) pursuant to CPL 440.10 (1) (h), as unconstitutionally obtained with insufficient evidence of depraved indifference; (2) pursuant to CPL 440.10 (1) (g), on the ground that there was newly discovered evidence which was of such character as to create a probability of a verdict more favorable to the defendant if it had been received at trial; and (3) pursuant to CPL 440.10 (1) (f) and (h), on the ground that the prosecution violated its duty to disclose exculpatory material consisting of the same newly discovered evidence (*see People v DiGuglielmo*, 21 Misc 3d 1103[A], 2008 NY Slip Op 51938[U] [2008]). The County Court denied as unsubstantiated the claim based upon the alleged tape recordings.

## Sufficiency of the Evidence

█ The People correctly contend that the defendant's motion pursuant to CPL 440.10 to vacate the judgment on the ground that the trial evidence was insufficient to establish that he acted with depraved indifference should have been summarily denied. A court "must deny" a motion pursuant to CPL 440.10 when the ground or issue raised "was previously determined on the merits upon an appeal from the judgment" (CPL 440.10 [2] [a]). The defendant here, on direct appeal to this Court, contested the sufficiency of the evidence, and the issue was decided against him under the law in effect at the time of the judgment (*see People v DiGuglielmo*, 258 AD2d 591 [1999]).

The sole exception to mandatory summary denial under these circumstances is if there has been a "retroactively effective change in the law controlling such issue" since the time of the appellate determination (CPL 440.10 [2] [a]). Although the law regarding depraved indifference murder has changed subsequent to the defendant's direct appeal (*see People v Feingold*, 7 NY3d 288 [2006]; *People v Suarez*, 6 NY3d 202 [2005]), the Court of Appeals has unequivocally instructed that the new depraved indifference standard is not to be applied retroactively by way of a CPL article 440 motion (*see People v Jean-Baptiste*, 11 NY3d 539, 543 [2008]; *Policano v Herbert*, 7 NY3d 588, 603-604 [2006]).

## Newly Discovered Evidence

■ The County Court also erred in granting the defendant's motion on the ground of newly discovered evidence.

At the CPL article 440 hearing, Dillon testified that, beginning October 3, 1996 and ending October 8, 1996, he was interviewed by DFPD detectives three or four times for about two to four hours each time. For all interviews after October 3rd, the detectives would arrive unannounced at his home or place of work and transport him to DFPD headquarters, where he was taken to an "interview or interrogation type of room." He was offered something to eat and drink and the officers treated him respectfully, without yelling, raising their voices, or doing anything physically threatening. Dillon felt intimidated and nervous, however, and attributed these feelings to his age of 20 years and the number of unexpected visits by several officers, who transported him to the police station and asked the same questions over and over. He felt it was a "very intimidating, pressurized atmosphere."

Dillon further testified that the statements he made to news reporters and the DFPD on October 3, 1996 were accurate when made because his memory was fresh. His October 3rd statement to the DFPD that Campbell was "still swinging the bat" at DiGuglielmo Sr. was changed on October 8th to say that Campbell was "holding the bat in a baseball type stance and was not swinging the bat at anyone" and "was just holding the bat to protect himself and did not have the intention of seriously hurting anyone" when he was shot. The October 8th statement contained words Dillon would not have used and phrases that did not sound like his manner of speech, but he signed it because he felt intimidated and tired from all the interviews. After October 8th, the police did not bother him again because, Dillon believed "the statement was up to their satisfaction." Dillon's testimony in the grand jury and at trial was consistent with the October 8th statement because he felt "stuck" or "locked into" it, or possibly the detectives had led him to believe in its truth.

James White, a former regular Deli patron, testified at the CPL article 440 hearing that he witnessed the entire incident and believed that the defendant had acted in defense of DiGuglielmo Sr. He explained that he did not testify for the defendant at trial because he had promised his 76-year-old father, who did not trust defense attorneys, that he would not speak to them. White conceded that, in 1996, he was an alcoholic and addicted to prescription drugs, but denied taking any drugs on the

day of the shooting and claimed that he drank only one beer afterward.

At the hearing, recalling events that had happened more than 11 years prior, White described Campbell as coming "violently" at the defendant and DiGuglielmo Sr.; it took all three men to subdue him. When Campbell took the bat out of the Corvette, he swung it at DiGuglielmo Sr.'s head, and at the moment he was shot, Campbell was "aggressively approaching [DiGuglielmo Sr.], swinging the baseball bat at his head." There was no question in White's mind, then or now, that the shots "were fired by a son defending his father's life." White gave no testimony regarding the relative positions or distance between Campbell and DiGuglielmo Sr.

On the evening of the shooting, White gave a statement to the DFPD in which he said that Campbell "was still swinging the bat in a wild aggressive manner in the direction of [DiGuglielmo Sr.]" when the defendant shot him. He testified at the CPL article 440 hearing that he believed the detectives were not pleased with his statement. He was interviewed a total of "[t]hree or four" times and "shown different scenarios of what other people had said." The sessions were "several hours" each, but may have seemed longer than they actually were because he did not feel free to leave. The atmosphere was "very polite," but the detectives were "relentless" and wanted him to agree with other statements. He felt he was questioned "more like a suspect than a witness."

After these additional interviews, White signed a second statement at DFPD headquarters on October 11, 1996 in which he continued to assert that Campbell was swinging the bat at DiGuglielmo Sr. at the moment he was shot. The October 11th statement, however, removed the words "wild aggressive manner" and inserted new sentences, including statements that White did not see how Campbell had gotten to the other side of the parking lot because he was watching the defendant go inside for the gun and that he felt "hypnotized the whole time which made it hard . . . to judge distance."

In opposition to the motion, the People called Assistant District Attorney Patricia Murphy, who had conducted the prosecution in 1996 and 1997. She testified that neither the DFPD detectives nor Dillon ever informed her of interviews other than those on October 3rd, 7th and 8th. She disclosed to the defense all witness statements and police memo book entries, and they did not contain notes of additional interviews. During prepara-

tion for grand jury and trial, Dillon did not mention the additional police interviews and could not explain the changes in his statements, but appeared embarrassed about them. He "was resolute" and "very firm," however, that Campbell was not swinging the bat at the moment he was shot. Dillon never told ADA Murphy that his testimony in the grand jury or at trial was false or coerced by the police.

Detective James Guarnieri testified at the hearing that, on October 3, 1996, he interviewed White, who said that Campbell had been swinging the bat when he was shot. Guarnieri was also aware that O'Donnell had made a similar statement to a DFPD detective. The next morning, October 4th, the DFPD decided to charge the defendant with murder. On October 7, 1996 the members of the detective squad made a collective decision to re-interview Dillon because his statement differed from "the vast majority of other witnesses" who said that Campbell was not swinging the bat when he was shot. Dillon was interviewed only two times, October 3rd and October 7th into October 8th. The detectives also decided to re-interview O'Donnell and White because they, like Dillon, had said that Campbell was swinging the bat, and "[o]bviously" those were "the three that actually had differences, as compared to the majority of the other witnesses."

At 10:00 P.M. on October 7th the entire DFPD detective squad, consisting of Guarnieri, two other detectives, and Chief Longworth, picked Dillon up at his workplace and took him to the DFPD station in Chief Longworth's car; Dillon rode in the back seat with two of the detectives. In a windowless "all purpose room," Detectives Guarnieri and Gelardi conducted the interview. They had a "calm . . . methodical type of conversation" and did not raise their voices. Dillon was offered coffee or soda and was treated like a witness, not a defendant; he did not complain of being tired or confused. Dillon made changes to his October 3rd statement, claiming the October 3rd statement was inaccurate because he had been caught up in the "excitement" and was "charged up" when the press interviewed him. Guarnieri typed the October 8th statement and read it to Dillon, who signed it without making changes.

In the order appealed from, the County Court credited the testimony of Dillon and White and discredited the testimony of ADA Murphy and Detective Guarnieri with respect to the existence of additional police interviews of Dillon and White on dates in between their respective signed statements. Even as-

suming the correctness of the County Court's credibility determinations, however, we find, contrary to the conclusion of the County Court, that the defendant failed to meet his burden of establishing that the newly discovered evidence was of such character as to create a probability that, had it been received at trial, the verdict would have been more favorable to the defendant (*see* CPL 440.10 [1] [g]).

In determining the probable effect of the newly discovered evidence on the verdict, the court must engage in a "critical analysis of the evidence" and "view and evaluate all of the evidence in its entirety" (*People v Tankleff*, 49 AD3d 160, 180-181 [2007]). Here, that review must take place in the context of the central legal issue at trial, i.e., whether the defendant's action in shooting Campbell was justified. If the defendant's action was justified, it cannot be the basis of a depraved indifference murder (*see People v McManus*, 67 NY2d 541, 548 [1986]).

Penal Law § 35.15 (1) provides:

> "A person may . . . use physical force upon another person when and to the extent he or she reasonably believes such to be necessary to defend himself, herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person."

Use of "deadly physical force" is justified only when "[t]he actor reasonably believes that such other person is using or about to use deadly physical force" (Penal Law § 35.15 [2] [a]), which is defined as "physical force which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury" (Penal Law § 10.00 [11]; *see People v Magliato*, 68 NY2d 24, 29 [1986]). Evaluation of the actor's belief "requires a determination of reasonableness that is both subjective and objective . . . The critical focus must be placed on the particular defendant and the circumstances actually confronting him at the time of the incident, and what a reasonable person in those circumstances and having defendant's background and experiences would conclude" (*People v Wesley*, 76 NY2d 555, 559 [1990]; *see People v Goetz*, 68 NY2d 96, 114-115 [1986]; *People v Daniel*, 35 AD3d 877, 878 [2006]; *People v Torres*, 252 AD2d 60, 65 [1999]).

Here, the evidence, taken as a whole, established that Campbell struck DiGuglielmo Sr. in the knee when they were next to the Corvette, but did not strike again as he backed away from DiGuglielmo Sr. and Errico a distance of approximately 40 to 50

feet from the Corvette. Campbell never actually used the bat as a deadly weapon and was not actually using deadly physical force at the moment he was shot (*cf. People v Scharpf*, 60 AD3d 1101, 1102 [2009]; *People v Soriano*, 36 AD3d 527 [2007]). According to the defendant's trial testimony, however, he subjectively believed that Campbell's use of deadly physical force against DiGuglielmo Sr. was imminent. The viability of his justification defense required the jury to credit his testimony as to his subjective belief, and to further find that his belief was objectively reasonable given the circumstances actually confronting him and what a reasonable person in those circumstances and having his background and experiences would conclude (*see People v Wesley*, 76 NY2d at 559; *People v Baa*, 189 AD2d 771, 772 [1993]).

At trial, the jury rejected the justification defense after considering significant evidence of Campbell's aggressiveness, including his retaliatory strike with the bat when he first removed it from the Corvette and his threatening movements and waggling of the bat as he backed up, including testimony that he swung it at DiGuglielmo Sr. and Errico "every time they got closer." Had the newly discovered evidence also been available and received at trial, there is no reasonable probability that the jury would have come to a different determination. The newly discovered evidence that Dillon, O'Donnell, and White may have seen Campbell still swinging the bat at the moment he was shot does not significantly increase the level of Campbell's aggressiveness, nor does it change the relative positions and distances between the parties.

Considering the trial evidence together with the newly discovered evidence, we find that the defendant failed to establish the probability that the jury would have found his belief in Campbell's imminent use of deadly force to be objectively reasonable under all the circumstances. Campbell did not strike DiGuglielmo Sr. near his head or other vital area, indicating a lack of intent to use the bat as a deadly weapon. Although the defendant, during the seconds it took him to retrieve the handgun, did not witness Campbell's retreat to the edge of the parking lot, upon emerging from the Deli, he would have seen that DiGuglielmo Sr. was up and moving, indicating that Campbell had not used the bat against him a second time. DiGuglielmo Sr. and Errico were in positions facing Campbell, indicating that they had been pursuing Campbell rather than the other way around. In this context, even considering the trial evidence that

Campbell was as close as 5½ feet from DiGuglielmo Sr. and the new evidence that Dillon, O'Donnell, and White may have seen Campbell swinging the bat, Campbell was manifestly not pursuing DiGuglielmo Sr., who was in control of his own positioning in relation to Campbell. Given the fact that the defendant's gun was a far swifter deadly instrument than the bat in Campbell's hands, there was time to display the handgun and deliver a warning. In this regard, the jury was entitled to consider the defendant's testimony as to his background and training as a police officer to use deadly force only as a last resort.

In sum, considering the trial and newly discovered evidence in combination, the circumstances did not support an objectively reasonable inference that a deadly strike with the bat was imminent. Had the jury heard the evidence of undue police pressure on witnesses and fully credited the October 3rd statements of Dillon, O'Donnell, and White, the People still would have disproved the defense of justification beyond a reasonable doubt. The defendant, thus, failed to meet his burden of establishing the probability that, had the newly discovered evidence been received at trial, the verdict would have been more favorable to him, and the County Court erred in granting that branch of the defendant's motion which was pursuant to CPL 440.10 (1) (g) to vacate the judgment on the ground of newly discovered evidence.

### Brady

Similarly, because the defendant's *Brady* claim was based upon the same newly discovered evidence, the defendant failed to meet his burden of establishing a "reasonable probability" that nondisclosure of the evidence affected the outcome of the trial (*see People v Hunter*, 11 NY3d 1, 5 [2008]; *People v Moore*, 43 AD3d 1085 [2007]). Thus, the County Court erred in granting that branch of the defendant's motion which was pursuant to CPL 440.10 (1) (f) and (h) to vacate the judgment on the ground of a *Brady* violation.

Accordingly, the order is reversed insofar as appealed from, that branch of the defendant's motion which was pursuant to CPL 440.10 to vacate the judgment is denied, the judgment is reinstated, and the matter is remitted to the County Court, Westchester County, which, upon at least two days' notice to the defendant and his attorney, shall promptly direct the defendant to surrender himself to the court in order that execution of the judgment may resume (*see People v Moore*, 43 AD3d 1085 [2007]).

In light of our determination, we need not reach the People's remaining contentions.

COVELLO, J.P., SANTUCCI and CHAMBERS, JJ., concur.

Ordered that the order is reversed insofar as appealed from, on the law, that branch of the defendant's motion which was pursuant to CPL 440.10 to vacate the judgment is denied, the judgment is reinstated, and the matter is remitted to the County Court, Westchester County, which, upon at least two days' notice to the defendant and his attorney, shall promptly direct the defendant to surrender himself to the court in order that execution of the judgment may resume.