[992 NE2d 402, 970 NYS2d 474]

In the Matter of DASHAWN W. and Others, Children Alleged to be Abused. ADMINISTRATION FOR CHILDREN'S SERVICES, Respondent, ANTOINE N., Appellant, et. al., Respondent.

Argued March 20, 2013; decided April 25, 2013

**POINTS OF COUNSEL**

*Elisa Barnes*, New York City, for appellant. I. By legislative design the severe abuse statute applies to very few cases. (*Matter of Leon K. [Marilyn O.]*, 69 AD3d 856; *Matter of Candace S.*, 38 AD3d 786; *Matter of Latifah C.*, 34 AD3d 798; *Matter of Kayden E. [Luis E.]*, 88 AD3d 1205, 18 NY3d 803; *Leader v Maroney, Ponzini & Spencer*, 97 NY2d 95; *Rosner v Metropolitan Prop. & Liab. Ins. Co.*, 96 NY2d 475; *Matter of Bliss v Bliss*, 66 NY2d 382.) II. The Commissioner of the New York City Administration for Children's Services did not submit evidence of diligent efforts to reunite appellant with his children and under the statutory scheme could not have been excused from such efforts. (*Matter of Borkowski v Borkowski*, 38 AD2d 752; *Loeb v Loeb*, 14 AD2d 270; *Matter of Leon K. [Marilyn O.]*, 69 AD3d

856, 83 AD3d 1069; *Matter of Candace S.*, 38 AD3d 786; *Matter of Latifah C.*, 34 AD3d 798.) III. Appellant Antoine N. was erroneously found to have acted with depraved indifference to Jayquan's life. (*People v Suarez*, 6 NY3d 202; *People v Best*, 85 NY2d 826; *People v Poplis*, 30 NY2d 85; *People v Goodridge*, 251 AD2d 85.)

*Michael A. Cardozo, Corporation Counsel*, New York City (*Deborah A. Brenner* and *Kristin M. Helmers* of counsel), for respondent. I. The Appellate Division correctly ruled that the father's conduct evinced depraved indifference to Jayquan's life. (*Matter of Marino S.*, 100 NY2d 361; *People v Cole*, 85 NY2d 990; *People v Poplis*, 30 NY2d 85; *People v Bryce*, 88 NY2d 124; *People v Bowman*, 48 AD3d 178, 10 NY3d 808; *People v Maddox*, 31 AD3d 970; *People v Paul*, 209 AD2d 447, 85 NY2d 865; *People v Suarez*, 6 NY3d 202; *Matter of Jessica MM.*, 122 AD2d 462; *People v Luck*, 294 AD2d 618, 98 NY2d 699.) II. Diligent efforts to reunite the family should not be a part of a fact-finding of severe abuse. In the alternative, such efforts were properly excused here. (*People v Caban*, 14 NY3d 369; *Matter of Rivera v Smith*, 63 NY2d 501; *Telaro v Telaro*, 25 NY2d 433.)

*Steven Banks, Legal Aid Society*, New York City (*Claire V. Merkine* and *Tamara A. Steckler* of counsel), Attorney for the Children. I. The Appellate Division erred in the first appeal in remanding the case for a hearing on diligent efforts, where a finding that diligent efforts were made or excused is not required for a severe abuse finding under Family Court Act § 1051 (e). In any event, the Appellate Division properly affirmed in the second appeal the Family Court's finding that diligent efforts should be excused. (*Matter of Marino S.*, 100 NY2d 361; *Long v State of New York*, 7 NY3d 269; *Matter of New York State Assn. of Criminal Defense Lawyers v Kaye*, 96 NY2d 512; *Frank v Meadowlakes Dev. Corp.*, 6 NY3d 687; *Zappone v Home Ins. Co.*, 55 NY2d 131; *Rohring v City of Niagara Falls*, 84 NY2d 60; *Matter of Leon K. [Marilyn O.]*, 69 AD3d 856; *Matter of Carlos R.*, 63 AD3d 1243.) II. The Appellate Division correctly found that appellant evinced depraved indifference to his child's life.

## OPINION OF THE COURT

READ, J.

We hold that the phrase "circumstances evincing a depraved indifference to human life" does not mean the same thing for purposes of Social Services Law § 384-b (8) (a) (i) as it does

under the Penal Law. Second, a showing of diligent efforts to encourage and strengthen the parental relationship is not prerequisite to a finding of severe abuse under Family Court Act § 1051 (e) where the factfinder determines that such efforts would be detrimental to the best interests of the child.

I

On February 23, 2007, the Commissioner of the New York City Administration for Children's Services (the Commissioner or ACS) filed related petitions under article 10 of the Family Court Act against Antoine N. and Ronnelle B. with respect to the four children who resided with them: five-month-old Jayquan N., five-year-old Justin N., five-year-old Diamonaysia B., and two-year-old Dashawn W. Antoine and Ronnelle are Jayquan's parents, while Antoine is Justin's father and Ronnelle is the mother of Diamonaysia and Dashawn. ACS had carried out an emergency removal pursuant to Family Court Act § 1024 the previous day, after social workers at Bellevue Hospital Center reported suspected child abuse to the Statewide Central Register of Child Abuse and Maltreatment.

The petitions in these child protective proceedings alleged that Jayquan, whom Antoine brought to Bellevue on the evening of February 21, 2007—hours after he claimed that the baby screamed in a way unlike ever before—had been admitted with a "shifted and fractured collar-bone with swelling"; and that, upon further examination, hospital personnel discovered four partially healed fractured ribs.[1] The petitions also asserted that Antoine "inflict[ed] excessive corporal punishment" on Justin by hitting him with a "black wire," thereby causing "excessive welts to his body"; and that Ronnelle failed to intervene to protect him. The Commissioner sought orders determining, upon clear and convincing evidence, that these four children were severely or repeatedly abused, and, upon a preponderance of the evidence, that they were abused and/or neglected.

At the ensuing fact-finding hearing, ACS called Dr. Lori Legano, who examined Jayquan at Bellevue on February 22, 2007, acting as a consultant with a child protection team; Dr. Legano was qualified as an expert in pediatrics and child abuse. She testified that the fracture of Jayquan's left collarbone (or

---

1. Jayquan remained hospitalized at Bellevue until discharged on March 2, 2007 to the custody of an ACS caseworker for placement in a designated foster boarding house.

clavicle) was sustained within less than a week before his admission to the hospital, and that the most likely cause was a direct blow to the shoulder. Because of the level of force required to inflict this injury, Dr. Legano rejected Antoine's explanation—that two-year-old Dashawn pulled Jayquan's arms while he sat in his "bouncy chair"[2] the day before Antoine took Jayquan to the hospital—as medically implausible. According to Dr. Legano, a two year old could not have generated enough force to separate Jayquan's clavicle by pulling on his arms. For the same reason, she discounted the notion, suggested by Antoine's attorney, that Jayquan may have broken his collarbone when one of the other children hit him, or fell against him while he sat in the bouncy chair, thereby somehow propelling him onto the floor. Dr. Legano ruled out birth trauma as the cause of Jayquan's fractured collarbone because his medical records disclosed an unremarkable delivery and the break was so fresh; and based on Jayquan's medical records and the results of blood and other tests, she eliminated other possible causative factors (e.g., insufficient vitamin D, malnourishment, low bone density). Dr. Legano testified that a clavicle fracture was not life-threatening and would heal on its own without any treatment, but Jayquan would experience discomfort in the meantime unless he kept his shoulder "totally still."

As for Jayquan's four broken ribs, Dr. Legano testified that "a lot of force" would have been required to cause these injuries. Further, the fractures were all on the baby's left side, rather than bilateral, as would be expected if one of the other children stood or stamped on Jayquan while he lay on the floor, which Antoine's attorney speculated may have happened. In the absence of a major trauma such as a car accident, Dr. Legano viewed Jayquan's broken ribs as most likely an "inflicted injury" caused by "direct force to the middle of the chest," or "blunt trauma to the side of the chest"; she added that, given the pliability of an infant's ribs, fractures are a classic sign of

---

2. Dr. Legano sometimes referred to the "bouncy chair" as an "ExerSaucer," which is a brand name for a stationary play center. The "bouncy chair," a picture of which was entered into evidence, consists of a round or saucer-shaped base with an elevated swivel seat in the middle; a tray surrounds the seat. These products allow babies old enough to sit and hold up their heads unassisted to remain upright to practice standing, and to entertain themselves by rocking, spinning, bouncing and playing with available, often built-in, toys. They are designed to be stable and so are unlikely to tip over; they do not allow movement around a room, and thus eliminate the risk of falls down stairs or stumbles.

child abuse, almost always caused by an intentional act. Her observation of callus formation caused Dr. Legano to conclude that Jayquan had sustained these injuries between two weeks and several months before his admission to the hospital. She opined that Jayquan's discomfort should have been noticeable because as his chest expanded with each breath, the broken edges of the ribs would rub together, causing virtually continuous pain.

An ACS caseworker, who interviewed each member of the family, testified that Antoine and Ronnelle surmised that Jayquan must have broken his ribs in mid-December 2006 when he and two-year-old Dashawn were playing on a bed with their maternal grandfather, and Dashawn either hit or kicked Jayquan. The caseworker, who also physically examined each of the children for signs of abuse, observed "black linear marks . . . too many to count" on Justin's chest, stomach, inner thigh and buttocks. Antoine conceded that he had lashed the child with an electrical cord, which he justified as punishment meted out after discovering Justin and Diamonaysia, both five years old, doing "adult things." The caseworker added that when she tried to comfort Dashawn as he was crying, he yelled at her, "Get out of my face . . . [b]efore I get my belt," which Diamonaysia explained Antoine said "all the time."

Antoine did not testify at the hearing or call any witnesses. Family Court took judicial notice of a finding of abuse against Antoine in 1994 relating to his infant son, Antoine, Jr. In a fact-finding decision and order entered on April 11, 1994, Family Court found that then four-month-old Antoine, Jr. sustained bilateral subdural hematomas in his brain, four fractured ribs on his left side and a fractured wrist and skull; that Antoine and the infant's mother provided no satisfactory or convincing explanation for these injuries; and that the brain injuries were so serious that it was unknown whether Antoine, Jr. would fully recover or, instead, suffer from mental retardation.

At the conclusion of the hearing, Family Court determined that Antoine and Ronnelle abused Jayquan "in that[,] while in the care of [Antoine and Ronnelle, the] child sustained fractures of the clavicle and of the left 4-7 ribs . . . [and Antoine and Ronnelle] have not offered any credible explanation for any of

these injuries";[3] and that they neglected[4] and derivatively abused Justin, and derivatively abused and neglected Dashawn and Diamonaysia.[5] While finding that Jayquan sustained

---

**3.** Family Court Act § 1012 (e) defines an "abused child" as a child under 18 years old

> "whose parent or other person legally responsible for his care
>
> "(i) inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ, or
>
> "(ii) creates or allows to be created a substantial risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ, or
>
> "(iii) commits, or allows to be committed an offense against such child defined in [Penal Law article 130, governing sex offenses]; allows, permits or encourages such child to engage in any act described in [specified provisions of the Penal Law relating to prostitution]; commits any of the acts described in [specified provisions of the Penal Law relating to incest]; or allows such child to engage in acts or conduct described in [Penal Law article 263, governing sexual performance by a child] provided, however, that (a) the [Penal Law's] corroboration requirements . . . and (b) the age requirement for the application of article [263] shall not apply."

**4.** Family Court Act § 1012 (f) (i) (B) defines a "neglected child" to include a child under 18 years old

> "whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof, *including the infliction of excessive corporal punishment*" (emphasis added).

**5.** As we noted in *Matter of Marino S.* (100 NY2d 361, 373-374 [2003], *cert denied sub nom. Marino S. v Angel Guardian Children & Family Servs.*, 540 US 1059 [2003]), while article 10

> "is silent with respect to derivative findings of abuse[,] . . . indirect support . . . may be found in the evidentiary rule set forth in Family Court Act § 1046 (a) (i), which provides that 'proof of the abuse or neglect of one child shall be admissible evidence on the issue of the abuse or neglect of any other child of, or the legal responsibility of, the respondent' " (*see* Merril Sobie, Practice Commentaries, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 1012 at 44-46 [discussing the derivative doctrine as it has developed in New York]).

"[s]erious physical injury, . . . protracted, painful, [and] horrible injuries," Family Court nonetheless dismissed the petition insofar as it alleged severe abuse against Antoine.[6] The judge believed that, in view of our decision in *People v Suarez* (6 NY3d 202 [2005]), severe abuse under Social Services Law § 384-b (8) (a) (i)—which requires a finding that Antoine acted "under circumstances evincing a depraved indifference to human life"—could almost never be established unless an eyewitness testified to the manner in which the harm was inflicted. Supported by the Attorney for the Children, ACS appealed from Family Court's dismissal of the claim of severe abuse; Antoine did not cross-appeal the judge's findings of serious physical injury and abuse.

In May 2010, the Appellate Division reversed (73 AD3d 574 [1st Dept 2010]). The court first held that Family Court was not constrained by *Suarez* because "Social Services Law § 384-b (8) (a) encompasses conduct which is either intentional or reckless, unlike Penal Law § 125.25 (1) and (2), which, pursuant to *Suarez*, are almost always mutually exclusive"; and "[i]n any event, *Suarez* recognized that in cases involving abused children, conduct evincing depraved indifference to human life may be present in a one-on-one situation" (*id.* at 574).

The Appellate Division then found that "the baby sustained . . . serious physical injuries while in the care of [Antoine], and the parents failed to provide an adequate explanation"; and noted that Family Court "was entitled to draw the strongest negative inference against the father based on his failure to testify in the proceedings" (*id.* at 575). As a result, "father's conduct directed at the infant was sufficient to demonstrate depraved indifference to the child's life" (*id.*). Citing Social Services Law § 384-b (8) (a) (i) and (iv), the Court then noted that, "due to [Family Court's] misinterpretation of *Suarez*, it never reached the issue of whether [ACS] exercised diligent efforts to

**6.** At the conclusion of ACS's case, Family Court granted Ronnelle's motion to dismiss the charge of severe abuse against her on the ground that ACS had not made a prima facie showing. ACS never seems to have formally abandoned the charge of repeated abuse, although Ronnelle was not subject to any prior findings of abuse, and Antoine's prior abuse finding dated from 1994 (*see* Social Services Law § 384-b [8] [b] [ii] [A] [providing that a child is "repeatedly abused" by a parent if "the child or another child for whose care such parent is or has been legally responsible has been previously found, *within the five years immediately preceding* the initiation of the proceeding in which such abuse is found, to be an abused child" (emphasis added)]). The judge did not mention repeated abuse in her fact-finding ruling.

strengthen the parental relationship"; and therefore remanded for the lower court to decide "if [ACS] exerted such efforts or whether such efforts are excused, since a finding of severe abuse is admissible in a subsequent proceeding to terminate parental rights" (*id.*).

Upon remand, Family Court determined that diligent efforts should be excused because they would be "detrimental to the best interests of the child(ren)." In support of this finding, the judge cited Antoine's 1994 abuse adjudication, remarking that "we come now to . . . a time approximately 14 years later, when [Antoine] has again displayed egregious conduct towards a child [u]nder circumstances evincing a depraved indifference to the [child's] life and health." According to Family Court, the earlier incident, in combination with the events leading to these petitions, demonstrated that the "prognosis for change in [Antoine's] indifferent behavior is poor." The judge therefore found that "efforts to encourage and strengthen the parental relationship would be detrimental to the best interests of [Jayquan] as they would consign him to a further protracted stay in foster care, thereby depriving him of permanency and of a normal, healthy and safe life, with virtually no likelihood of ultimate reunification."

Antoine appealed Family Court's order excusing diligent efforts and, at the same time, moved for leave to appeal to us. After we dismissed his motion upon the ground that simultaneous appeals do not lie (16 NY3d 767 [2011]), the Appellate Division affirmed (91 AD3d 505 [1st Dept 2012]). In that court's view,

> "Family Court properly determined, in light of [the] prior determination that there was clear and convincing evidence that the child . . . was 'severely abused[,]' . . . that such '[a]ggravated circumstances' (Family Ct Act § 1012 [j]) excused ACS from exercising diligent efforts to reunite the father with the child because such efforts would be detrimental to the best interests of the child and are unlikely to be successful in the foreseeable future" (*id.* at 506).

The Appellate Division rejected the "father's attempt to characterize the Family Court's proceedings conducted pursuant to [the remand] as a wholly distinct and separate hearing," concluding instead that they were merely a "continuation of the prior fact-finding hearing" (*id.*).

We granted Antoine leave to appeal (19 NY3d 804 [2012]), and now affirm, although for slightly different reasons.

## II

At the conclusion of the fact-finding phase in an article 10 proceeding, Family Court may,

> "[i]n addition to a finding of abuse, . . . enter *a finding of severe abuse . . . as defined in [Social Services Law § 384-b (8) (a)]*, which shall be admissible in a proceeding to terminate parental rights pursuant to [Social Services Law § 384-b]. If the court makes such additional finding of severe abuse . . . , the court shall state the grounds for its determination, which *shall be based upon clear and convincing evidence*" (Family Ct Act § 1051 [e] [emphases added]).

Section 384-b (8) (a) of the Social Services Law, in turn, specifies that "[f]or the purposes of this section [384-b]," which governs termination of parental rights, a child is "severely abused" if

> "(i) the child has been found to be an abused child as a result of *reckless or intentional acts of the parent committed under circumstances evincing a depraved indifference to human life,* which result in serious physical injury to the child as defined in [Penal Law § 10.00 (10)];[7] or

> "(ii) the child has been found to be [a sexually abused child]; provided, however, the [parent] must have committed or knowingly allowed to be committed [1 of 11 enumerated felony sex offenses] . . . ; or

> "(iii) [the child's parent has been convicted of certain felony offenses under the Penal Law,[8] and] the victim or intended victim was the child or another child of the parent or another child for whose

---

7. Section 10.00 (10) of the Penal Law defines "serious physical injury" as "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ."

8. The felony offenses include first- or second-degree murder, first- or second-degree manslaughter, or an attempt to commit murder or manslaughter; criminal solicitation, conspiracy or criminal facilitation for conspiring, soliciting or facilitating these crimes; or first- or second-degree assault or aggravated assault upon a person less than 11 years old or any attempt to commit these crimes.

care such parent is or has been legally responsible; or . . . the parent of such child has been convicted under the law in any other jurisdiction of an offense which includes all of the essential elements [of these crimes]; *and*

"(iv) *the agency has made diligent efforts* to encourage and strengthen the parental relationship, including efforts to rehabilitate the respondent, when such efforts will not be detrimental to the best interests of the child, and such efforts have been unsuccessful and are unlikely to be successful in the foreseeable future. Where a court has previously determined in accordance with this chapter or the family court act that reasonable efforts to make it possible for the child to return safely to his or her home are not required, the agency shall not be required to demonstrate diligent efforts as set forth in this section" (Social Services Law § 384-b [8] [a] [i]-[iv] [emphases added]).

In this appeal, the parties differ as to what is required to establish "circumstances evincing a depraved indifference to human life" within the meaning of Social Services Law § 384-b (8) (a) (i); and whether the diligent efforts specified by subparagraph (iv) of this provision are prerequisite to a finding of severe abuse under Family Court Act § 1051 (e), or may be excused under Family Court Act §§ 1039-b and 1012 (j) or, alternatively, Social Services Law § 384-b (8) (a) (iv) itself.

Depraved Indifference

ACS, joined by the Attorney for the Children, argues that our cases discussing "circumstances evincing a depraved indifference to human life" within the meaning of the Penal Law do not control the interpretation of the same phrase in Social Services Law § 384-b (8) (a) (i). Antoine, by contrast, considers "depraved indifference" to require the same showing under both statutes. The facts in this case, he argues, "though disquieting and unpleasant, simply do not rise to the level of depraved indifference" discussed in *Suarez* and other cases in the progression of decisions culminating in *People v Feingold* (7 NY3d 288 [2006] [recounting the evolution of the Court's depraved indifference jurisprudence]; *see also Policano v Herbert*, 7 NY3d 588 [2006] [same]). In *Feingold,* we held that depraved indifference denotes a culpable mental state beyond mere recklessness, and explicitly overruled *People v Register* (60

NY2d 270 [1983]). *Register* had stood for the proposition that depraved indifference was "neither the *mens rea* nor the *actus reus*" of a crime, but rather referred to "the factual setting in which the [defendant's] risk creating conduct must occur" (*id.* at 276) so that "the focus of the offense [was] upon an objective assessment of the degree of risk presented by defendant's reckless conduct" (*id.* at 277; *see also Policano*, 7 NY3d at 599-600).

Under the Penal Law, a person acts "intentionally" when "his conscious objective" is to cause a proscribed result (for example, death) or engage in conduct described by a statute (Penal Law § 15.05 [1]); and a person acts "recklessly" with respect to a proscribed result or a circumstance described by a statute "when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists" (Penal Law § 15.05 [3]). And "depraved indifference" bespeaks a state of mind reflecting "a depraved kind of wantonness: for example, shooting into a crowd, placing a time bomb in a public place, or opening the door of the lions' cage in the zoo" (*Feingold*, 7 NY3d at 293 [internal quotation marks omitted]). It is "best understood as an utter disregard for the value of human life—a willingness to act not because one intends harm, but because one simply doesn't care whether grievous harm results or not[, and which reflects] wickedness, evil or inhumanity, as manifested by brutal, heinous and despicable acts" (*Suarez*, 6 NY3d at 214). The Penal Law establishes crimes that are mutually exclusive, depending on these distinctions of culpable state of mind; specifically, second-degree intentional murder (Penal Law § 125.25 [1] [mens rea of intent to kill]), as contrasted with second-degree depraved indifference murder (Penal Law § 125.25 [2] [mens rea of recklessness plus mens rea of depraved indifference]), as contrasted with second-degree manslaughter (Penal Law § 125.15 [mens rea of recklessness]).

▮ The same cannot be said of the child protective statutes. Social Services Law § 384-b (8) (a) (i) provides that a child can be found to be severely abused "as a result of reckless *or* intentional *acts* of the parent committed under circumstances evincing a depraved indifference to human life" (emphases added). Under the Penal Law, however, a crime requiring proof of an intent to kill can never be committed with depraved indifference (*see Policano*, 7 NY3d at 600 ["(I)t has never been permissible in New York for a jury to convict a defendant of depraved indifference murder where the evidence produced at trial

indicated that if the defendant committed homicide at all, he committed it with the conscious objective of killing the victim" (internal quotation marks omitted)]). Additionally, "[a] defendant may be convicted of depraved indifference murder when but a single person is endangered in only a few rare circumstances" (*Suarez*, 6 NY3d at 212), whereas acts of child abuse necessarily involve one-on-one violence. In short, our depraved indifference jurisprudence under the Penal Law has no bearing on whether a child is severely abused within the meaning of Social Services Law § 384-b (8) (a) (i). For purposes of that statute "circumstances evincing a depraved indifference to human life" refers to the risk intentionally or recklessly posed to the child by the parent's abusive conduct.

■ Here, Antoine beat or struck a baby—an especially vulnerable victim because so tiny, defenseless and unformed. And Dr. Legano's testimony about the age of Jayquan's injuries established that Antoine must have attacked him on at least two different occasions, separated by at least two weeks. Further, Antoine had to have been aware of the life-threatening risks he created when he applied brute force to Jayquan's chest and shoulder. After all, he knew that devastating injuries ensued when he brutalized his then four-month-old namesake, Antoine, Jr. While this prior instance of abuse was too remote in time to support a finding of repeated abuse, it reflects Antoine's utter disregard for Jayquan's life, health and well-being. Additionally, Antoine neglected to summon medical aid for Jayquan's fractured ribs, even though the baby would have to have experienced and displayed continuous pain and distress; and he delayed seeking medical care for Jayquan on February 21, 2007 from 11:00 a.m., when he claimed to have first noticed the baby's suffering, until the early evening hours.[9] Finally, Antoine offered unbelievable explanations for Jayquan's injuries to medical personnel and social workers, and he did not testify at the fact-finding hearing (*see Matter of Nassau County Dept. of Social Servs. v Denise J.*, 87 NY2d 73, 79 [1995] [where the mother did not testify in a child protective proceeding, we noted that "(a) trier of fact may draw the strongest inference that the opposing evidence permits"]). Thus, there is record support for the Appellate Division's finding, based on clear and convincing evidence, that Antoine, acting under circumstances evincing a depraved indifference to human life, severely abused Jayquan.

---

**9.** The record from the hospital's pediatric emergency service is date-stamped 8:17 p.m. on February 21, 2007.

Diligent Efforts

At no time did ACS make "diligent efforts to encourage and strengthen the parental relationship, including efforts to rehabilitate" Antoine (*see* Social Services Law § 384-b [8] [a] [iv]). This is undisputed. What the parties instead contest is whether this omission was permissible in light of Family Court Act §§ 1051 (e), 1039-b and 1012 (j). The Attorney for the Children, joined by ACS, urges that a showing of diligent efforts is not required for a finding of severe abuse under Family Court Act § 1051 (e), while Antoine naturally insists otherwise. But Antoine also maintains that diligent efforts are incapable of being excused under Family Court Act §§ 1039-b and 1012 (j) on the basis of severe abuse. So for very different reasons leading to diametrically opposite practical outcomes, the Attorney for the Children and Antoine both take the position that the Appellate Division erred when, in the first appeal, it remanded this case to Family Court for a finding as to whether diligent efforts were made or excused. The Attorney for the Children argues in the alternative, though, that Family Court was permitted to and properly excused diligent efforts pursuant to Social Services Law § 384-b (8) (a) (iv) itself.

Section 1039-b (a) of the Family Court Act states that "[i]n conjunction with, or at any time subsequent to, the filing of a[n abuse or neglect] petition . . . , the [presentment agency] may file a motion upon notice requesting a finding that reasonable efforts to return the child to his or her home are no longer required." The statute further provides that reasonable efforts "shall not be required" when "the parent of such child has subjected the child to *aggravated circumstances, as defined in*" Family Court Act § 1012 (j) (Family Court Act § 1039-b [b] [1] [emphasis added]).[10] Family Court Act § 1012 (j) defines

---

**10.** Additionally, reasonable efforts are not required where the parent has been convicted of the murder or manslaughter of another child of that parent (Family Court Act § 1039-b [b] [2]); the parent has been convicted of an attempt to commit murder or manslaughter, or of criminal solicitation, conspiracy or criminal facilitation for conspiring, soliciting or facilitating those crimes, and the victim or intended victim was the child or another child of that parent (*id.* § 1039-b [b] [3]); the parent has been convicted of first- or second-degree assault or aggravated assault upon a person less than 11 years old, and this criminal conduct caused serious physical injury to the child or another child of the parent (*id.* § 1039-b [b] [4]); the parent has been convicted "in any other jurisdiction of an offense which includes all of the essential elements of" any of the foregoing crimes, and the victim was the child or another child of the

*(n. cont'd)*

"aggravated circumstances" to include "where a child has been either *severely or repeatedly abused,* as defined in" Social Services Law § 384-b (8) (emphasis added).[11]

First, Antoine takes as a given that Family Court Act §§ 1039-b and 1012 (j) provide the only way for a presentment agency to sidestep diligent efforts. Then he reasons—in "[a]n almost Talmudic exercise in statutory application, following the trail of FCA § 1051 (e) to Social Services Law § 384-b (8) to FCA § 1039-b to FCA § 1012 (j)"—that a finding of severe abuse pursuant to Family Court Act § 1051 (e) can never serve as an "aggravated circumstance" excusing "reasonable efforts to return the child to his or her home" pursuant to Family Court Act §§ 1039-b (a), (b) (1) and 1012 (j) because Social Services Law § 384-b (8) (a) requires diligent efforts as a prerequisite to a finding of severe abuse. Antoine asserts that his analysis is not circular and does not render Family Court Act § 1039-b (b) (1) meaningless because a court might have previously determined, as also provided for in subparagraph (iv) of section 384-b (8) (a), that reasonable efforts were not required to return a severely abused child to his or her family on the basis of one of the grounds enumerated in Family Court Act § 1039-b (b) (2)-(6) (*see* n 10, *supra*).

The Attorney for the Children points out that the legislature in 1999 adopted Family Court Act § 1039-b and amended Family Court Act § 1051 (e) and Social Services Law § 384-b (8) (a) to implement the Federal Adoption and Safe Families Act (ASFA). ASFA clarified when states must engage in reasonable efforts to bring parents and an abused or neglected child back together, and when these efforts could or should be excused or discontinued. To address the "uncertainty about the reasonable efforts

---

parent (*id.* § 1039-b [b] [5]); or "the parental rights of the parent to a sibling of [the] child have been involuntarily terminated" (*id.* § 1039-b [b] [6]).

11. "Aggravated circumstances" also include instances where the child has been found to be repeatedly abused within the meaning of Social Services Law § 384-b (8) (b); the child "has subsequently been found to be an abused child [within the meaning of Family Court Act § 1012 (e) (i) or (iii)] within five years after [the] return home following placement in foster care as a result of being found to be a neglected child"; the parent "has refused and . . . failed completely, over a period of at least six months from the date of removal" to engage in or secure reunification services; or "a court has determined a child five days old or younger was abandoned by a parent with an intent to wholly abandon such child and with the intent that the child be safe from physical injury and cared for in an appropriate manner" (*see* Family Ct Act § 1012 [j]).

standard [that] sometimes delays State action in making children available for adoption," Congress therefore "permit[ted] the State[s] to bypass" the "reasonable efforts criterion" in cases where a parent subjected a child to "aggravated circumstances" as defined under state law, and to "move expeditiously to terminate parental rights and make [these abused and neglected children] available for adoption" (HR Rep No. 105-77, 105th Cong, 1st Sess at 7-8, reprinted in 1997 US Code Cong & Admin News at 2739, 2739-2740; *see also Marino S.*, 100 NY2d at 369-370 ["The effect of a finding of aggravated circumstances under the Family Court Act—like the effect of a finding of severe abuse under the Social Services Law (severe abuse itself constitutes an aggravated circumstance)—is to dispense with the requirement that an agency responsible for having placed the children in foster care or seeking to terminate parental rights exercise diligent or reasonable efforts to reunite the (parent[s]) with the children"]).

▮ The Attorney for the Children objects that Antoine's view of the interplay of the Family Court Act and the Social Services Law, which negates severe abuse as an independent basis under Family Court Act § 1039-b (b) (1) for excusing reasonable efforts, runs counter to ASFA's express purpose "to expedite permanency for children who suffer . . . the 'aggravated circumstance' of severe abuse." Seeking to harmonize the statutes in a way faithful to ASFA's goals and New York's concomitant statutory scheme, she maintains that the legislature, "when referencing the definition of 'severe abuse' in Social Services Law § 384-b (8) (a) in Family Court Act §§ 1012 (j) and 1051 (e), intended *to borrow only the abusive acts described in [subparagraphs] (i) through (iii)* of Social Services Law § 384-b (8) (a), and not the diligent efforts showing of [subparagraph] (iv)" (emphasis added). This approach "completely resolves the circularity and incongruity" created by Antoine's interpretation of the statutes "and fully accords with the purpose of ASFA."

Finally, the Attorney for the Children advances the alternative position that if subparagraph (iv) of Social Services Law § 384-b (8) (a) is, in fact, incorporated into article 10's definition of severe abuse, as Antoine argues, then Family Court is authorized to excuse diligent efforts upon a finding that they would be detrimental to the child's best interests. We agree. First, we conclude that Family Court Act §§ 1051 (e) and 1012 (j) necessarily import Social Services Law § 384-b (8) (a) *in its entirety.* We simply cannot read subparagraph (iv) out of the definition of

severe abuse incorporated in these provisions when the legislature did not choose to create such an exclusion, as it easily might have. Second, Social Services Law § 384-b (8) (a) (iv) clearly states that Family Court may excuse diligent efforts when they are found to be detrimental to the best interests of the child.

To recapitulate, Social Services Law § 384-b (8) (a) defines a child as "severely abused" if the victim of depraved indifference abuse (*id.* § 384-b [8] [a] [i]), *or* felony sex offense abuse (*id.* § 384-b [8] [a] [ii]), *or* other felony offense abuse (*id.* § 384-b [8] [a] [iii]), *and*

> *"the agency has made diligent efforts* to encourage and strengthen the parental relationship, including efforts to rehabilitate the respondent, *when such efforts will not be detrimental to the best interests of the child,* and such efforts *have been unsuccessful and are unlikely to be successful* in the foreseeable future. *Where a court has previously determined* in accordance with this chapter or the family court act *that reasonable efforts to make it possible for the child to return safely to his or her home are not required, the agency shall not be required to demonstrate diligent efforts* as set forth in this section" (*id.* § 384-b [8] [a] [iv] [emphases added]).

Thus, for a court to find severe abuse under Family Court Act § 1051 (e), the presentment agency must demonstrate by clear and convincing evidence that the parent committed an abusive act specified in subparagraphs (i), (ii) *or* (iii) of section 384-b (8) (a); *and* diligent efforts to reunite the family were not made because detrimental to the child's best interests; *or* such efforts were made but were unsuccessful and unlikely to succeed in the near term; *or* such efforts were not required because a court had previously determined that reasonable efforts to reunite the family were unnecessary.

The Attorney for the Children is surely correct that the legislature adopted Family Court Act § 1039-b to "expedite permanency planning for abused children by enabling the agency to obtain an immediate determination—during the underlying abuse proceeding—of whether it must exercise diligent efforts, without first having to expend considerable effort . . . until a ruling [could] finally be sought in the subsequent termination proceeding" (*see Marino S.,* 100 NY2d at 371). The proposition that the legislature "borrowed" only the abusive acts described

in Social Services Law § 384-b (8) (a) (i)-(iii) when referring to section 384-b (8) (a) in Family Court Act §§ 1051 (e) and 1012 (j) is thus intuitively appealing. Perhaps this is what the legislature meant to do. The statutory language, however, does not admit of this interpretation. In sum, both Antoine and the Attorney for the Children weave complex interpretive skeins to justify their preferred outcomes. Each asks us to disregard section 384-b (8) (a) (iv) in the context of child protective proceedings, either wholly (the Attorney for the Children) or in part (Antoine). We opt instead for a straightforward reading of Family Court Act §§ 1051 (e) and 1012 (j) and Social Services Law § 384-b (8) (a).

■ Finally, Family Court in this case properly found that diligent efforts to encourage and strengthen the parental relationship would be detrimental to Jayquan's best interests, in accordance with Social Services Law § 384-b (8) (a) (iv). The judge determined that, in light of Antoine's abuse of Antoine, Jr., followed by his severe abuse of Jayquan some 14 years later, there was little prospect that Antoine's "chronic, long-standing" violent behavior would improve anytime soon, if ever, and it was not in Jayquan's best interests to languish in foster care in the meantime.

We have considered Antoine's other arguments and consider them to be without merit. Accordingly, the order of the Appellate Division should be affirmed, without costs.

Chief Judge LIPPMAN and Judges GRAFFEO, SMITH, PIGOTT and RIVERA concur.

Order affirmed, without costs.