Matter of Liam V. (Johnson V.—Lafayette B.) (2024 NY Slip Op 51692(U))

[*1]

Matter of Liam V. (Johnson V.—Lafayette B.)

2024 NY Slip Op 51692(U)

Decided on December 12, 2024

Family Court, Kings County

Pitchal, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 12, 2024
Family Court, Kings County

In the Matter of Liam V. 
 Children under Eighteen Years of Age Alleged to be Severely Abused, Abused, and Neglected 
 by Johnson V., Lafayette B., Respondents.

File No. 307481

Ahuva Kohanteb, Esq.
Administration for Children's Services
330 Jay Street, 12th Floor
Brooklyn, NY 11201
Brad Nacht, Esq.
26 Court Street, Suite 1805
Brooklyn, NY 11242
Counsel for Respondent Johnson V.
Daniella Mancini, Esq.
Catherine O'Neill, Esq.
Brooklyn Defender Services
177 Livingston St., 7th Floor
Brooklyn, NY 11201
Counsel for Respondent Lafayette B.
Lisa Podemski, Esq.
Legal Aid Society
330 Jay Street, Room 3112
Brooklyn, NY 11201
Attorney for the Child

Erik S. Pitchal, J.

By petition dated September 28, 2023, the Administration for Children's Services ("ACS") charged respondent father, Johnson V., and respondent mother, Lafayette B., with severe abuse, abuse, and neglect of their child, Liam V. (age 2 at the time) based on the death of his younger sister, Ella.
At the time of Ella's death, both children were in their parents' care, having been trial discharged following approximately 10 months in kinship foster care on a prior case. The full history of the family's involvement with ACS, beginning in August 2022, is essential background information to understand the current issues before the Court. See Matter of Liam V., 82 Misc 3d 359 (Kings Co. Fam. Ct. 2023). 
The undersigned conducted a fact-finding hearing as to the charges against both respondents. The record consisted of testimony from Dr. Ingrid Walker-Descartes, Dr. Amelia Baxter-Stoltzfus, EMS worker, Anthony Tortorici, and case planner, Jolie W. The hearing consisted of documentary evidence as listed below:
P1: Marked portions of Office of the Chief Medical Examiner records for Ella V.
P1A: Photographs from the Office of the Chief Medical Examiner records
P2: Marked portions FDNY records
P3: Marked portions of Kings County Hospital records for Ella V.
P4: Marked portions of SUNY Downstate Hospital records for Ella V.
P5: Marked portions of Maimonides Hospital records for Ella V.
P5A: the CALM report from Dr. Walker-Descartes
P6: marked portions of ACS case records
P7: 911 call
P7A: certification page for the 911 call
P8A and P8B: Body Worn Camera videos against Mr. V. only
P8C: the certification and delegation pages for the body worn camera videos
P9: CV of Dr. Ingrid Walker-Descartes
P10: CV of Dr. Amelia Baxter-Stoltzfus
P11: Oral Report Transmittal dated September 15, 2023
P12: Fact-Finding Order for dockets NN-15241-2/22
P13: Dispositional Order for dockets NN-15241-2/22
P14: Mental Health Services Report for Johnson V.
P15: Mental Health Services Report for Lafayette B.
Respondents presented no evidence at trial.[FN1]

The trial was conducted over the course of three dates, July 29, 2024, July 30, 2024, and December 12, 2024.
For the following reasons, the Court finds that petitioner has proven by clear and convincing evidence that the respondent mother and respondent father severely abused, abused, and neglected the subject child and enters findings against both respondents.
The gravamen of the petition is that the child, Ella V., suffered from severe injuries to her brain and body in September 2023 including brain bleeds, skull fractures, bruising, femur fractures, and a bite mark. which caused her death. The petition also alleges that the child Ella experienced these injuries while in the exclusive care of her parents, who also were exclusively caring for the subject child, Liam, and that the explanation provided by the parents as to how Ella suffered from these injuries is inconsistent with the medical presentation. Additionally, the petition alleges serious injuries to Ella from August 2022 for which both respondents were previously adjudicated neglectful, and a tongue laceration from September 2022. Liam is allegedly derivatively severely abused, abused, and neglected as a result of the actions toward Ella.
Testimony of Dr. Ingrid Walker-Descartes
Petitioner first called Dr. Ingrid Walker-Descartes, the head of Maimonides Hospital's child abuse unit. Dr. Walker-Descartes was qualified as an expert in child abuse pediatrics and testified credibly. As a prelude to the more focused testimony, Dr. Walker-Descartes testified about how a normal two-month old child would appear physically and medically. After establishing that baseline, Dr. Walker-Descartes testified about her first consult of Ella V. in August 2022 (at age 25 days) where she conducted a physical exam of Ella and ordered lab tests and imaging including a skeletal survey, MRI, and ophthalmology consultation. As a result, it was discovered Ella had normal and abnormal findings on her body. The abnormal findings consisted of classic bilateral distal tibial metaphyseal fractures through the growth plate of both ankles, some hemorrhages and a skull fracture. All these findings were considered highly suspicious of physical abuse and Dr. Walker-Descartes described the potential mechanisms that would lead to such injures, including forceful grabbing and twisting of the lower extremities, forceful slamming on a hard surface with extended legs, and tremendous impact to the side of Ella's head.[FN2]

Dr. Walker-Descartes next testified to examining Ella in September 2022, approximately two weeks after a hospitalization at Kings County Hospital in which Ella was treated for a tongue laceration. Upon examination at Maimonides, Dr. Walker-Descartes testified that Ella was observed to have a laceration on her tongue that was in a healing stage at this juncture. To [*2]obtain such an injury, notably to sever the base of the tongue from the musculature, a sharp object such as a knife or scissor would have to be utilized. The only explanation provided was that her injury was sustained from a bulb suction, which did not match the medical presentation. Dr. Walker-Descartes further testified that such injury would also not occur from a fingernail scratch as a fingernail is not sharp enough to sever the tongue as it is pretty rigid.[FN3]

The next interaction Dr. Walker-Descartes had with Ella was in September 2023 when she was transferred from Kings County Hospital for more specialized treatment. At this time, Ella presented in cardiac arrest with spontaneous return of circulation after resuscitation attempts by EMS. At this time, Ella was deemed to be neurologically devastated, or in simpler terms, Ella presented with no activity from the brain. Ella was easily intubated, a process that normally requires anesthesia and her brain was found to not be functioning. A physical examination was conducted, and Ella was found to be small for her age, had swelling to her forehead, a laceration on her scalp, swelling over one eye, overgrown fingernails and extremely matted hair in the back of her head. Furthermore, Ella was observed to have a healed bite mark on the back of her leg, specifically one of her thighs. The matting of the hair was noteworthy as it indicated Ella's beginning to walk and then no longer walking for a significant amount of time. A skeletal survey could not be done as Ella was not stable enough for that, but the imaging done indicated a fracture under the swelling on Ella's head and Ella presented with multiple subdural hematomas, both old and new. Ella further presented with multi-layer hemorrhages in her retina, injuries to her neck, and a fracture to her jaw. Dr. Walker-Descartes concluded that the subdural hematomas, retinal hemorrhages, and neck injuries were caused by the violent shaking of a child. Additionally, the jaw fracture's cause would be hitting a child's head against a hard object or a hard object hitting the child against her face. Ella also presented with bilateral fractures to her femur with bilateral callus formation, which is the body's method to repair the fracture, something that likely would impact a child's ability to crawl and walk.
Dr. Walker-Descartes further went on to date the injuries Ella presented with at Maimonides. As Ella had fractures on both sides of her skull and she also had a hematoma overlying the skull fracture, the medical indication is that the injury occurred approximately 72 hours prior to presentation at Maimonides. None of Ella's injuries could have been accidental. Moreover Dr. Walker-Descartes testified to old subdural hematomas not brought to medical attention, indicating a strong likelihood of multiple shaking incidents. The hip fractures could be dated to approximately two weeks old or even older given the callus formations, and the neurological devastation and cardiac arrest were results from incidents occurring hours before presentation. Choking on milk and care provided by emergency medical services were both ruled out as possible causes of injury. Ella never regained consciousness while at Maimonides in September 2023.
On cross examination, Dr. Walker-Descartes confirmed that the fractures to Ella's tibia and fibula sustained in August 2022 could not be caused by her ankles getting stuck in the slats of a crib. Additionally, Ella's injuries from August 2022 could not have led to her death in 2023 but do speak to the risks to a child. Additionally, more information was provided indicating that there was more than one shaking event as the brain bleeds were in different stages of healing and [*3]prior shaking events do impact subsequent events. Moreover, the testimony elicited indicated the injuries Ella sustained would have been painful for her.

 Testimony of Anthony Tortorici
Petitioner called Anthony Tortorici, the responding paramedic with the Fire Department of New York City, who testified credibly. Mr. Tortorici testified he responded to a 911 call regarding a pediatric patient in cardiac arrest. Upon arrival to the home, the fire engine company that was already there was running towards the ambulance with a child and they placed her on the stretcher and began assessing immediately. At presentation, there was no pulse or respirations, so they began CPR immediately and after two rounds of CPR, they were able to recover a pulse. Mr. Tortorici indicated his partner placed an intraosseous device, or IO, into the child's tibia to provide medication as needed, but they were unable to intubate the child, despite two attempts. Notice was provided to Kings County Hospital's emergency department that they were coming in with a critical case and upon arrival at the hospital, the emergency room staff was waiting for them and took over care.
In the ambulance the child's mother and a police officer were present. The ride lasted about seven to eight minutes. Mr. Tortorici testified that the child's mother appeared quiet and only spoke when the team was placing the IO and attempting intubation, asking why it needed to be done and stating that she did not believe they were necessary and could harm the child. Throughout the trip, the child had a heart rate but was not breathing on her own, which is why they continued to ventilate her. Upon questioning about Ella's history, Ms. B. denied the existence of any history.
On cross-examination, Mr. Tortorici clarified what CPR entails, a single round lasts approximately two minutes, around thirty compressions and two respirations. It took about four minutes to recover a pulse for Ella upon her presentation. Furthermore, it was clarified that the intubation failed twice because the EMS team was unable to physically see the inside of Ella's throat and as per Mr. Tororici, going in blind to intubate someone can cause harm. Therefore, they held off on making further attempts until Ella was brought to the hospital.
On redirect, it was clarified that the mask utilized during CPR and the force used to create a seal on the child would not independently cause any injuries in Mr. Tortorici's experience.

 Testimony of Jolie W.
Petitioner next called to the stand Jolie W., the case planner at Heartshare St. Vincent's Services, whose testimony the Court found credible notwithstanding the Court's grave concerns about the quality of her work in this matter. Ms. W. started her tenure as the case planner for Ella and Liam V. on June 28, 2023. At this time, the children were residing with their parents and her role was to make home visits and reach out to service providers if there were any services for follow up. Home visits occurred twice a month as the children were on trial discharge at the time.
Ms. W. testified that during home visits, the parents would both be present, Ella and Liam would be present, and sometimes the nurse from the agency would also be present. All of the visits were made around 10:00am. The home was described to be a studio apartment that is pretty small, with a bathroom, living area, and kitchen. In describing the size testimony was elicited in relation to the courtroom size which is about twenty-eight by thirty-four feet. Ms. W. testified that the apartment was smaller than the courtroom.
During the time Ms. W. was supervising the family, the children were not in daycare, and [*4]the parents continued to say they did not want the children in daycare as they wished to bond with the children. The parents continued to tell Ms. W. that the children had been out of their care for so long that they wanted the opportunity to get to know the children without other people around.
The agency held a conference by video on August 7, 2023, during which services were discussed and accolades were given to the parents for making it this far in their services. As to early intervention services, despite being court ordered the parents indicated they did not want the children evaluated because they wanted time with the children without any other people around given how long the children had been in foster care. The parents said they wanted time to bond with the children. Ms. W. also testified that the agency was concerned about the children not being taken to follow up medical appointments, such as Liam's cardiology appointment. Ms. W. could not recall what Ms. B. said when questioned but did indicate there was a point in the conference when she hung up. Mr. V. appeared upset and questioned why they have to take the kids to so many medical appointments. Ms. W. testified that her director, Ms. Chernofsky, explained the importance of attending all the appointments. In the period of Ms. W.'s assignment to the case, the medical appointments were not kept.
The last home visit conducted by the agency occurred two days before Ella was taken to the hospital in September 2023, and Ms. W. provided several details about this visit during her cross-examination. She explained that the case had been assigned to the agency's medical unit, resulting in monthly visits by a nurse in addition to the twice-monthly visits made by the case planner. Often, the nurse conducted her visit during one of the case planner's, which is what happened that day in September 2023. According to Ms. W., she met the nurse, Angela, around 10 a.m. at the parents' home and they conducted the visit together. The visit was similar to others they had conducted. On a normal visit, the case planner talks to the parents about how the children are doing, checks the carbon monoxide alarm, asks if the parents need anything, and asks about medical appointments. Ms. W. testified she also checked the refrigerator that day.
As to interacting with the children, Ms. W. said she likely said something like "hey buddy, what's going on." Ms. W. indicated she did not interact with Ella, just saw her in the pack 'n play drinking her bottle. The visit lasted maybe thirty to forty minutes. Ms. W. testified she did not observe Ella turn or move and spent the bulk of the time conversing with the parents, as did the nurse. Ms. W. testified that at no point did she hold Ella or Liam or pick them up. As part of the assessment of the children, Ms. W. testified that neither she nor the nurse take the children's clothes off, they just observed the body parts visible to the naked eye and neither one of them lifted the children in their assessments. Furthermore, Ms. W. indicated she had never observed Ms. B. holding Ella in any of the visits she conducted.

Testimony of Dr. Amelia Baxter-Stoltzfus
The final witness called by Petitioner was Dr. Amelia Baxter-Stoltzfus, an expert in forensic pathology, employed by the Office of the Chief Medical Examiner for three years. Dr. Baxter-Stoltzfus conducted an autopsy of Ella V. on September 23, 2023, and she testified credibly. As part of her autopsy, Dr. Baxter-Stoltzfus reviewed medical records from Ella's most recent hospitalization and more medical records that were brought to her throughout the course of the next couple of months.
A standard autopsy consists of an external exam in which the body is examined for identifying characteristics and photographs are taken. Next, the body is opened, and each internal organ is examined for evidence of injury or disease. Sometimes additional tests are [*5]ordered depending on what is revealed. In the case of a suspected homicide, additional tests may be ordered. Specific to Ella, and in children, additional testing is done, including full body x-rays and infectious disease testing, as well as removing the brain to get tissue samples examined. Because Ella was a suspected homicide, Dr. Baxter-Stoltzfus also removed all her skin and looked at the subcutaneous tissues for evidence of injury. Ella's eyes were removed and the bones in her neck were removed for further examination by neuropathology. The long bones of Ella's legs and her femurs, and some of her skull bones were removed and sent to the anthropology department for examination. These results were received several months later.
Dr. Baxter-Stoltzfus formed her conclusion regarding the manner of Ella's death, and its cause, on September 23, 2023 and signed her death certificate that day, but the final report regarding Ella's death was completed in March 2024. The results of the tests that came in months later served to further substantiate Dr. Baxter-Stoltzfus' assessment from September 2023.
Ella's physical examination revealed evidence of acute injury, including bruises on her forehead and lower mid back. She had two linear scabs on the left side of her head, one in front and above her ear and one slightly behind and above her ear. Contusions are considered a type of blunt force injury, and the scabs are also consistent with blunt force trauma, especially given the internal findings underneath them. The injuries to Ella's head would be inflicted at or around the time of death.
The internal findings during the autopsy revealed acute and subacute and old injuries. Acutely, Ella had a fracture of that side. he left parietal bone, which had no evidence of healing. The recent fracture had underlying areas of scabbing or laceration of the scalp and was also associated with significant bruising or hemorrhage of the skin and soft tissues under the scalp on the side. Additional hemorrhaging was observed in the soft tissues of the right side of Ella's head as well as some of the muscles on the right side of the head. These are all indicative of multiple impact sites from multiple traumatic events to Ella's head. Ella's head had an acute fracture on the left parietal and a subacute fracture on the right parietal bone, which showed evidence of healing. Given the evidence of healing on the right side, it very likely occurred days prior to the injury on the left side. In examining the brain, Ella had a subdural hemorrhage and a subarachnoid hemorrhage. Upon removal of the spinal cord, there were hemorrhages along the length of Ella's spinal cord and evidence of old subdural hemorrhage there as well as in the head. More hemorrhaging was observed around the optic nerves. Dr. Baxter-Stoltzfus was able to observe fractures of Ella's femurs and could date them to be weeks to months old.
As part of her testimony, Dr. Baxter-Stoltzfus reviewed a number of photographs taken as part of Ella's autopsy and detailed the injuries observed to further elucidate how and why her conclusions about the injuries were made.
Dr. Baxter-Stoltzfus indicated she could rule out natural causes of death for Ella as there was no evidence of natural disease or congenital abnormalities that could explain Ella's death. Furthermore, none of Ella's injuries are consistent with being sustained by EMS' resuscitating efforts. Nor would any of the injuries be a result of Ella choking.
On cross examination, Dr. Baxter-Stoltzfus testified it is accurate she did not observe a jaw fracture, which appeared in the records. There are many possibilities that could lead to this including sometimes imaging can pick up thin nondisplaced fractures that she may not be able to see grossly with her eyes. Other possibilities include possible misinterpretations, the fracture being older and wouldn't have the soft tissue response of a recent fracture.
Moreover, more information was provided regarding the nature of blunt force trauma to [*6]the head as the etiology of Ella's injuries. Dr. Baxter-Stoltzfus testified that a violent shaking possibly contributed to the injuries, but there is no way to make a distinction of shaking versus some other mechanism based on the presentation of the findings. However, the doctor cannot rule out shaking co-occurring, but knows that blunt force trauma is supported by the findings.
Furthermore, additional clarification regarding the femur fracture and callusing was elicited. Dr. Baxter-Stoltzfus could not date the fracture as the stage of healing indicates at least weeks to months.
On redirect, it was testified to that significant force would be required to cause Ella's injuries, especially with the constellation of acute injuries observed.

 Documentary Evidence
This Court reviewed the exhibits stated above, most of which supplement and support the testimony. Additionally, the respondents each submitted to mental health evaluations conducted by Health + Hospital Corporation's Family Court Mental Health Services clinic, and the Court carefully reviewed those portions of the evaluations that petitioner offered into evidence without objection. 
The clinician who evaluated Ms. B. indicated that Ms. B.'s account of her parenting history is implausible. The doctor had concerns about Ms. B.'s ability to meet Liam's needs. Ms. B. continued to minimize and provide implausible explanations with regard to the injuries sustained by Ella in all three major incidents described in testimony and in the records. The evaluation concluded Ms. B.'s reporting of the reasons for court involvement likely reflects a combination of poor insight and knowing denial.
The Court also reviewed Mr. V.'s mental health evaluation, which clearly indicates Mr. V. believes all the court involvement is based on false allegations. Mr. V. denied any role in Ella's death and said the injuries did not occur when Ella was in his care. In fact, Mr. V. reported to the evaluator that the paramedics and hospital should be investigated. The evaluator raised significant concerns regarding insight into the harms the children have undergone and even stated there appears to be a lack of attunement/empathy and a lack of remorse given the statements made by Mr. V. during the evaluation. 

 Decision
In New York, the relevant statutory scheme stems from the Family Court Act as well as Social Services Law. In relevant part Social Services Law reads
"a child is severely abused by his or her parent if (i) the child has been found to be an abused child as a result of reckless or intentional acts of the parent committed under circumstances evincing a depraved indifference to human life, which result in serious physical injury to the child as defined in subdivision 10.00 of the penal law."
SSL § 384-b(8)(a), Matter of Dashawn W., 21 NY3d 36; In re Amirah L., 118 AD3d 792, 793. The agency must establish the severe abuse by clear and convincing evidence. FCA §1051(e). Circumstances which demonstrate a depraved indifference to human life are not the same in cases of severe abuse as they are in penal law. Dashawn W. at 49. Where penal law crimes have distinctions based on culpable states of mind, a child can be found severely abused based on reckless or intentional acts of a parent. Id.
In conjunction with Social Service Law, the relevant Family Court Act section reads
"'Abused child' means a child less than eighteen years of age whose parent or other person legally responsible for his care
(i) inflicts or allows to be inflicted upon such child physical injury by other than [*7]accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ, or
(ii) creates or allows to be created a substantial risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ, or..."
FCA §1012(e)(i). In the instant case, Petitioner also seeks findings of neglect, which is governed by Family Court Act §1012(f), with the relevant section reading
"'Neglected child' means a child less than eighteen years of age
(i) whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care...
(B) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof, including the infliction of excessive corporal punishment;...
FCA §1012(f). Additionally, Petitioner's case is predicated on a theory of derivative severe abuse. The New York Court of Appeals has held that a derivative severe abuse finding is appropriate where "the common understanding that a parent whose judgment and impulse control are so defective as to harm one child in his or her care is likely to harm others as well." In re Marino S., 100 NY2d 361, 374 (2003). "It is additionally clear that children who are not themselves the direct targets of abuse may, in accordance with the proof, suffer damage from witnessing the severe abuse of their siblings." Id.
This case is further governed by Family Court Act § 1046(a)(ii) using the doctrine of res ipsa loquitor. Matter of Philip M., 82 NY2d 238 (1993) teaches that a prima facie case establishes a rebuttable presumption that the respondents abused the child as defined by Family Court Act § 1012(e). The respondents then have the burden to produce evidence to rebut the presumption. Even if the respondents produce no evidence, the petitioner always bears the burden of persuasion. 
Here, the evidence overwhelmingly supports a finding of severe and repeated abuse, abuse, and neglect being entered against both Mr. V. and Ms. B. by clear and convincing evidence regarding Ella, and derivative claims regarding Liam. It is uncontroverted that Ella V. suffered unimaginable injuries to her body, head, and brain which were medically deemed to be inflicted and sustained as a result of her parents' actions or inactions through multiple incidents at various points in her short life. There is no doubt in this record that the child, Liam, age two, was present and observed the actions that led to Ella's injuries and death. Ms. W.'s uncontested testimony makes clear that the home was a small studio apartment. However, even if not present, the findings made regarding both respondents' fatal actions or inactions with regard to Ella are so significant, they evince reckless conduct and a depraved indifference to human life. The fundamental flaw or defect in the respondents' understanding of the role of a parent and impaired judgment is abundantly evident.
Dr. Walker-Descartes and Dr. Baxter-Stoltzfus both testified credibly in support of their medical conclusions. Dr. Walker-Descartes detailed at least three separate but clear incidents of abuse inflicted upon Ella, which highlighted many injuries including skull fractures, brain bleeds, broken bones, and a bite mark, all in various stages of healing, that would cause a small [*8]child significant pain.
Dr. Baxter-Stoltzfus clearly testified that the cause of Ella's death was blunt force trauma to the head. The details and the careful assessment of each injury done by Dr. Baxter-Stoltzfus provide great insight into the pain Ella must have suffered at the hands of her parents, not just one time, but multiple times given the various acute and subacute medical findings.
Mr. V. and Ms. B. failed to rebut any of the evidence presented by Petitioner. Therefore, the facts as presented by the Petitioner are adopted as the factual findings on this case. The explanations provided by the parents, including Ella choking on her milk and EMS causing the injuries that led to Ella's death, are not just impossible in a purely logical sense, but insulting to her death. The Court draws a negative inference from their failure to be present for the majority of the testimony and failure to testify.
Any argument regarding the agency's failure to adequately supervise the children during the trial discharge, which this Court agrees exist as valid concerns, does not mitigate the culpability of Ms. B. and Mr. V. in the roles they each played in Ella's death. While it will not be known who inflicted the final injury that caused Ella's tragic demise in September of 2023, that is not the standard required for findings pursuant to the Family Court Act. Where there are two respondents, the petitioner bears the burden of proving, in a separate analysis of the evidence applied to each one of them, that it is more likely than not that each respondent caused (or allowed someone else to cause) the child's injuries. If there was only one incident of wrongdoing causing the injuries, then for petitioner to meet its burden as to both respondents, it must prove that each one was involved in that incident. Alternatively, the petitioner would have to prove that there were multiple incidents, and that each respondent was responsible for at least one of them in some capacity, either causing or allowing to cause.
Petitioner has done so here. Petitioner has proven at the prima facie stage that Ella suffered multiple incidents of inflicted injuries based on both doctors' dating of her injuries. Neither parent presented any evidence to rebut Petitioner's evidence, and the Court finds that petitioner has carried its ultimate burden of persuasion by clear and convincing evidence. Both parents were responsible for the children's safety and care at the time of the incident in August 2022 and September 2023, and in fact entrusted with it when the Court ordered a trial discharge in June 2023. Even taking the most generous assumption to each parent, that only one of them inflicted the fatal injuries in September 2023, given the prior findings of this Court dated March 17, 2023, the other parent is just as culpable in recklessly permitting further abuse to occur, including Ella's death. Matter of Jaiden H., 231 AD3d 478 (1st Dep't. 2024). 
Furthermore, this Court finds that even if only one parent inflicted all the injuries, the other allowed it in a manner evincing a depraved indifference to human life as is evidenced by the various facts presented at trial. Both parents' complete disregard for the pain and suffering Ella must have felt due to her injuries, including multiple fractures all over her body, brain bleeds, and even a bite mark, shows an immense lack of regard for human life. Moreover, the fact that instead of actually seeking care, the respondent mother tried to prevent EMS from providing medical care to Ella, is further evidence of her lack of care for Ella's severe injuries. Shifting the blame of Ella's death to insist she choked on milk and/or EMS caused her death while trying to save her is especially concerning given that it minimizes the severity of the situation to a degree that is so depraved it is offensive to the children.
Most significantly, despite all the interventions and services done by the parents, the complete lack of remorse, accountability, and insight into the events that led to Ella's death and [*9]the injuries sustained in the thirteen months prior to Ella's death, especially highlighted in the mental health evaluations, are further evidence of the respondents' depraved indifference to human life. See Matter of Amirah L., 118 AD3d 792 (2d Dep't. 2014). This evidence also supports a determination, pursuant to SSL § 384-b(8)(a)(iv), that efforts by the agency since Ella's death to encourage and strengthen the parents' relationship with Liam, and to rehabilitate the parents, have not been required, as such efforts would have been and presently are detrimental to Liam's best interests. It is amply evident, by clear and convincing evidence, that efforts made prior to Ella's death in this regard were not successful, and that additional efforts are likely to be unsuccessful for the foreseeable future. 

 Order
For the foregoing reasons, the Court hereby finds by clear and convincing evidence:
1. The respondent father, Johnson V.:
a. Severely abused Ella as per Social Services Law 384-b(8)(a)(i) and (iv)
b. Derivatively severely abused Liam
2. The respondent mother, Lafayette B.:
a. Severely abused Ella as per Social Services Law 384-b(8)(a)(i) and (iv)
b. Derivatively severely abused Liam
3. The respondent father, Johnson V.:
a. Abused Ella pursuant to Family Court Act 1012(e)
b. Derivatively abused Liam
4. The respondent mother, Lafayette B.:
a. Abused Ella pursuant to Family Court Act 1012(e)
b. Derivatively abused Liam
5. The respondent father, Johnson V.:
a. Neglected Ella pursuant to Family Court Act 1012(f)
b. Derivatively neglected Liam
6. The respondent mother, Lafayette B.:
a. Neglected Ella pursuant to Family Court Act 1012(f)
b. Derivatively neglected Liam
Dated: December 12, 2024
ENTER
Hon. Erik S. Pitchal, J.F.C.

Footnotes

Footnote 1:Both parents were present for the initial part of the trial, including the testimony of Dr. Walker-Descartes; however, they did not appear for any other witness or subsequent trial dates. Their attorneys participated fully in their absence.

Footnote 2:The injuries to Ella in August 2022 were the basis of a finding of neglect only, ACS having consented in March 2023 to not pursue an abuse finding. Dr. Walker-Descartes' opinion about Ella's August 2022 presentation was not presented to the Court until after Ella died. Matter of Liam V., 82 Misc 3d at 369-70.

Footnote 3:This allegation, and Dr. Walker-Descartes' opinion about it was also not presented to the Court until after Ella died. Liam V. at 381 n.16.